LINDA L. KOZIOL, APPELLEE, V.
DAVID D. KOZIOL, APPELLANT.
636 N.W.2d 890

Filed December 11, 2001.   No. A-00-596.

Pamela J. Dahlquist, of Kutak Rock, for appellant.

Brent M. Kuhn, of Harris, Feldman, for appellee.

HANNON, INBODY, and MOORE, Judges.

HANNON, Judge.

## INTRODUCTION

In this dissolution action, the trial court entered a decree settling all of the various issues except the division of David D. Koziol's pension benefits from the Omaha Fire Department. The decree stated that the marital portion of the pension should be equally divided, but reserved jurisdiction to enter a supplemental order in lieu of a qualified domestic relations order (QDRO). Later, the trial court entered a supplemental order, and David appeals from that order. David argues that the court can only divide the marital "value" of the pension, that is, his contribution to the pension while married, and that the supplemental order changed the distribution of the pension from that contained in the previous decree. We conclude that the order entered as a decree was not a final order, but that the supplemental order entered made it final. We also conclude that the court could enter a decree dividing the marital portion of the pension equally, but that the formula used in the supplemental order could give Linda L. Koziol some of the nonmarital portion of the pension. Accordingly, we modify the formula used to divide the marital portion of the pension equally and remand to incorporate our modification.

The parties were married on July 14, 1973. They had one daughter, who had reached the age of majority at the time of decree. Throughout the marriage, David was employed full time by the Omaha Fire Department. Linda held various jobs during the course of the marriage, and at the time of the decree, she was employed full time.

In October 1998, Linda filed a petition for dissolution. A trial was held on April 19, 1999. The trial judge announced his decision by letter shortly thereafter, but the court was confronted with the difficulty of dividing David's pension in view of the fact that the city of Omaha does not recognize a QDRO order. A hearing was held on that issue, and on August 6, 1999, a decree

was entered dissolving the parties' marriage and settling all of the other issues, including alimony, property settlement, and attorney fees. The trial court purported to divide the marital portion of David's pension but reserved jurisdiction to enter a supplemental order in lieu of a QDRO order. All of the issues appealed concern the division of David's pension.

## SUMMARY OF EVIDENCE

As a result of his work as a firefighter for the city of Omaha, David held two pension funds, which were designated as pre-414h and 414h. (Except for unclear references to a possible difference in their taxability upon withdrawal, the record does not explain why there are two funds rather than one.) A letter from the senior payroll clerk of the city of Omaha to David told him that as of December 31, 1998, the amount of the "Pre 414h" fund was $64,904.09 and the amount of the 414h fund was $62,272.60, for a total of $127,176.69. There is no clear evidence showing the meaning or significance of these figures. The letter from the payroll clerk stating these figures refers to the amounts as contributions, but also refers to interest, and does not clearly state the entire value of David's contributions, or even his contributions plus interest on his contributions. In his testimony, David called these funds "what [I have] paid in." He also testified that since the December 31, 1998, date used by the payroll clerk, he had paid in more money, and that on the day of trial, the pension fund held $129,284. He also testified that if he would retire on the day of the trial and take all of the money out, he would receive his contributions. As will be explained later, this figure is clearly not the value of the pension, but we assume David was correct when he testified that the $129,284 is what he contributed over the course of his employment with the fire department.

In his brief, David called these figures the value of the pension. Linda also refers to these figures as the value of the pension, but at the same time asks for a share of the pension benefits David will receive. Linda's counsel somewhat inconsistently argues that the "payouts over the years can exceed what that value is." Whatever these figures represent, they do not represent the value of David's actual pension benefits.

The letter from the payroll clerk stating the above figures also states the following:

> Pre-414h contributions cannot be rolled over, and the interest portion will be taxable to you if you terminate your employment and withdraw your funds. The entire 414h total would be taxable under these circumstances. There are no provisions for withdrawal prior to termination of employment.
>
> Depending on your years of service, you may be able to vest your pension. If you leave employment, please inquire in the Personnel Department to either vest or withdraw your funds.

David takes the position that Linda should receive only slightly less than one-half of the $129,284, or approximately $63,000 in cash, less estimated income taxes, as the marital portion of the pension. We observe that the letter from the payroll clerk shows that not all of the fund (the noninterest portion of the pre-414h contribution) would be taxable, but no evidence shows the actual amount that would be taxable.

An exhibit that accompanied the letter from the payroll clerk, entitled "City of Omaha Pension Estimate," gives an estimate of David's retirement benefits if he should retire and information on how that pension is calculated. This exhibit shows that David was 49 years of age on December 31, 1998, having been born on October 16, 1949, that his "projected retirement date" is October 16, 1999, and that at retirement, he will have 27 years 9 months of service with the fire department. It shows the date of his pension membership is January 3, 1972. The parties were married on July 14, 1973.

This document states that in calculating the pension at the time of retirement, David's last 5 years of income will be reviewed and that the "highest 26 consecutive pay periods will be identified and used." Other evidence shows David is paid 26 times per year. The estimate also states that the pension will vary from the estimate. In this document, it states that for the estimate of his pension, his income over the past 2 years had been reviewed, and that the income for the period from January 1998 to December 12, 1998, was selected as a basis for the estimate. It also states what types of compensation he might receive that will be used to determine his income. The document estimates David's monthly pension will be $3,660.29 upon retirement at age 50.

David was eligible to retire on October 16, 1999, immediately following the April 19 hearing. Thus, if he had retired on October 16, he could have started his pension, or he could have withdrawn his contribution, which is the $129,284 that he paid into the fund plus any sum he contributed after April 19. David testified that he planned on continuing his employment with the Omaha fire department and that he was a battalion chief holding the position of fire marshal. He is in good health except for a bad back and high blood pressure. It is possible that he could be transferred to another position, but if he made a move, it would be a lateral one with no increase in pay. He did not have any capability of advancing. David testified that he took an assistant fire chief's test and placed seventh. He testified that the department has only one or two positions for assistant fire chief and that the city has reduced the positions so there are not going to be tests given in the future. David testified that a new contract between the fire department and the city of Omaha assures him of automatic raises for the next 2 years, but there is no evidence showing the amount or date of these expected pay increases.

David testified that if he works until age 60 and retires, the amount of the money he will receive from his pension will go up. He also testified that the city of Omaha does not have a QDRO and that if he dies, Linda could not get any of his pension even if the court should order it.

During this testimony, the trial court indicated a familiarity with QDRO orders under the federal Employee Retirement Income Security Act and questioned this testimony. David's counsel then stated that he understood the QDRO order was not available because David's employer was exempt from the federal act and that the city of Omaha has a policy of not accepting QDRO's. Linda's counsel suggested the use of a supplemental order, which she asserted could accomplish the same effect as a QDRO.

David asked the court to award him all of his pension. He introduced an exhibit, that he testified was prepared by his accountant, which combined 4 months of his 1999 income ($18,343), an Aetna annuity valued at $98,088 (ultimately awarded to David), and the $129,284 that could be withdrawn from the pension fund upon his retirement to arrive at $245,715.

From this figure, the exhibit shows that the standard deduction and personal exemption allowed for income tax were subtracted to get a figure designated as taxable income. David testified that the preparer of the exhibit computed the federal and state income tax on this figure and allocated a portion of the computed tax to the annuity, the pension fund, and the earnings. The exhibit displays the accountant's computation of the net after-tax value of the combined value of the pension fund and annuity at $143,126. David testified that this exhibit shows that the preparer of the exhibit takes the position that if David would retire on the date of trial and take all the money out of his pension fund and the annuity, he would have $143,126 after taxes. He requested that the court give him the pension fund and the annuity, to be valued at $143,126.

David started working January 3, 1972, and the parties were married on July 14, 1973. At the time of the decree, the pension fund had accrued over a period of 27 years 3 months (327 months), but at the time of retirement eligibility, the fund would have accrued for a period of 27 years 9 months 13 days. The parties were married 25 years 9 months at the time of the trial on April 19, 1999. By our calculations, that is 309 months of marriage.

By a letter dated April 27, 1999, the judge announced his decision on all points. In that letter, the judge stated that "[t]he Petitioner shall be awarded a one half interest in that portion of Respondent's pension earned during the time of the marriage, payable when Respondent retires." By a letter dated July 8, 1999, the judge informed the parties:

> I intend that the pension be divided and allocated in such a way that Mrs. Koziol will receive a portion of Mr. Koziol's retirement benefits upon retirement. That portions of the monthly payment that she would receive would be that percentage of the monthly benefit accrued during the marriage as related to the total benefit payable.

By correspondence and in subsequent hearings, David argued that a cash settlement of 96 percent of half of the $126,000 value (probably this statement was a short way of saying half of the marital portion of $129,284) was the only possible and fair distribution, in spite of the fact that the hearings were clearly held

for the purpose of accomplishing the judge's intent as expressed in those letters. There is no indication in the record that the judge intended to change his position from that announced in those letters.

After the judge announced his intended decision, the judge and the parties corresponded, and on August 6, 1999, a hearing was held in an attempt to settle upon a decree which would effectuate the judge's intended decision in a manner that would be acceptable to the city of Omaha. David reargued his position and even stated an offer that he would pay Linda $63,000 in cash for the pension benefits and ignore the possible tax consequences. Linda argued that she be awarded one-half of that portion of the pension that accrued during the marriage. Linda argued that a result similar to that obtainable by a QDRO order could be accomplished by a supplemental decree and that a share of the future pension benefit was more valuable than the "cash value." Apparently, both parties came prepared with a proposed decree containing a provision which would adopt their respective views. The judge took the decree proposed by Linda to study and signed it the same day.

The decree purported to settle all of the numerous issues of the dissolution. With respect to the division of the pension the decree states:

> *Petitioner shall be awarded a portion of Respondent's Pre 414h and 414H retirement account benefits (except the Aetna account) with the City of Omaha, in an amount equal to the actuarial equivalent of fifty-percent (50%) of the Marital Portion of the Respondent's Accrued Benefit . . . . The Marital Portion shall be determined by multiplying Respondent's Accrued Benefit by a fraction (less than or equal to 1.0), the numerator of which is the number of months of Respondent's service with the City of Omaha Fire Department while receiving Pre 414h or 414h benefits earned during the marriage (from July 14, 1973 to April 19, 1999), and the denominator of which is the total number of months of Respondent's service . . . as of the earlier of his date of cessation of benefit accruals or the date the Petitioner commences her share of the benefits hereunder. All said accounts (Pre 414h and 414h) shall be allocated*

between the parties through the use of a Supplement to Decree in lieu of a Qualified Domestic Relations Order (QDRO) so as to result in no immediate tax recognition to either party. *The Supplement to Decree to be prepared by Petitioner's legal counsel herein and approved by the Court herein for which the Court shall retain jurisdiction in this matter for entry of the supplement to Decree in Lieu of the Qualified Domestic Relations Order.*

(Except for a few words which we will discuss in detail later, the portion of the quoted material which is in italics was quoted in the supplemental order. We do this to make it easier to compare the decree and the supplemental order.)

On April 4, 2000, Linda filed a motion for entry of a supplement to decree of dissolution, and a hearing was held thereon on April 25. At that hearing, Linda introduced evidence consisting of a copy of a "Supplement to Decree of Dissolution" which had been submitted to the Omaha City Attorney's office for approval and the city attorney's comments to Linda's proposed supplement. The city attorney stated the changes that would be necessary to make the supplement acceptable to the city and also commented on the following provision of the supplement drafted by Linda, paragraph 9, to-wit:

[T]he Alternate Payee's benefit shall consist of fifty (50) percent of the gross amount of the marital portion of the Participant's vested and accrued benefit as of the date on which the Participant becomes eligible to receive benefits upon disability, retirement, or otherwise provided by the Plan . . . at the time the Alternate Payee begins receiving any benefit payments under the Plan, including disability, retirement, or otherwise.

The city attorney's comment was that that provision appears to give Linda additional benefits if David continues to work for a period of time prior to commencement of benefits and that if that is what the parties contemplated, the provision was acceptable to the city. The sentence in paragraph 9 to which the city attorney referred in her comments remained in the supplemetal order which was signed by the judge. The interpretation of this paragraph by the city attorney is arguably correct. Since we have concluded that the formula used by the judge must be

altered for other reasons, this possible defect will be removed by this opinion.

David's counsel presented a proposed supplement to decree, which he advised the court was also approved by the city of Omaha. He maintained that by its terms, the decree already awarded Linda the cash amount and not a share of the pension when it was received. The proposed supplement he presented directed the city to pay Linda 50 percent of 96.3 percent (David's calculation of the marital portion) of David's pension fund accrued as of April 19, 1999, or $61,235.57. It provided that Linda may commence her benefit as administratively feasible under the plan and that she should receive her benefit "as a portion of the Participant's (David's) monthly benefit, payable for as long as the Participant lives." In an affidavit, David stated that April 19, 1999, was used for the value of the pension fund because it was the date nearest the trial date.

In the affidavit, David swore that his proposed decree complied with the plan; that indexing is not available under the plan; that the pension plan prevents David from collecting Social Security benefits unless he works for 2 more years, at which point he will receive 40 percent of minimal Social Security; and that Linda will be eligible to receive from $500 to $700 per month in Social Security if she retires at age 62. This affidavit is the first time that Linda's Social Security is put forth as a reason for decreasing the amount of the pension fund to which Linda was entitled.

At the hearing on April 25, 2000, both parties presented arguments in support of the supplement they respectively proposed and arguments in opposition to the supplement proposed by the opposing party. The judge allowed time for briefing and took the matter under advisement.

On May 24, 2000, the trial court filed a "Supplement to Decree of Dissolution" (supplemental order), which used the form submitted by Linda. This supplemental order contained the above-quoted provision and the formula for determining the marital portion. In addition, it provided that the court retain jurisdiction in the event of any dispute concerning the order. In summary, it also provided (1) that a copy of the supplemental order be sent to the city of Omaha officials; (2) that the parties

were to keep the plan administrator advised of their respective current addresses; (3) that Linda's share be distributed directly to her; (4) that Linda "shall participate in the indexing of benefits, if applicable"; (5) that Linda shall be entitled to receive the benefits in any form available, but shall pay all costs arising by reason of her benefits; (6) that if benefits due Linda are paid to David, he shall reimburse her within 48 hours; and (7) that if the pension plan is replaced by a successor plan, her rights shall continue in the replacement plan. David appeals from this supplemental order.

## ASSIGNMENTS OF ERROR

David assigns that the trial court erred in entering the supplemental order because (1) it is inconsistent with the trial court's allocation of marital assets found in the decree of dissolution; (2) it awards Linda further contributions to David's pension fund that are not assets of the marital estate; and (3) it unjustly enriches Linda, who will be eligible for Social Security benefits, while David is not eligible for Social Security as a result of his status as a beneficiary to the city of Omaha's police and fire pension plan.

## STANDARD OF REVIEW

■ In actions for dissolution of marriage, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. This standard of review applies to the trial court's determinations regarding division of property, alimony, and attorney fees. *Meints v. Meints*, 258 Neb. 1017, 608 N.W.2d 564 (2000).

The division of property is a matter entrusted to the discretion of the trial judge, which will be reviewed de novo on the record and will be affirmed in the absence of an abuse of discretion. *Harris v. Harris*, 261 Neb. 75, 621 N.W.2d 491 (2001).

Because appeals in domestic relations matters are heard de novo on the record, an appellate court is empowered to enter an order which should have been made as reflected by the record. *Shockley v. Shockley*, 251 Neb. 896, 560 N.W.2d 777 (1997).

■ When reviewing a question of law, an appellate court has an obligation to resolve the question independently of the conclusion

reached by the trial court. See *Nebraska Nutrients v. Shepherd*, 261 Neb. 723, 626 N.W.2d 472 (2001).

## ANALYSIS

*Jurisdictional Argument.*

Linda claims that this court lacks jurisdiction to consider the issues raised in David's brief. In this respect, she argues that the decree of dissolution was a final order, that David did not appeal from it, and that therefore, he cannot raise the issue of the division of his pension in this appeal. By his first assignment of error, David alleges that the trial court erred in entering the supplemental order because it was inconsistent with the decree. These arguments are settled by a determination of one issue, and that is, the finality or lack of finality of the decree.

The power of courts to vacate or modify their own judgments is limited. *Karrer v. Karrer*, 190 Neb. 610, 211 N.W.2d 116 (1973). While the law is clear that during the term the trial court has the inherent power to modify its judgment, see *Hyde v. Shapiro*, 216 Neb. 785, 346 N.W.2d 241 (1984), an order of May 2000 would not appear to have been entered in the same term as the one of August 6, 1999. It is well settled that once a decree for dissolution becomes final, its meaning is determined as a matter of law from the four corners of the decree itself. *Klinginsmith v. Wichmann*, 252 Neb. 889, 567 N.W.2d 172 (1997). See, also, *Universal Assurors Life Ins. Co. v. Hohnstein*, 243 Neb. 359, 500 N.W.2d 811 (1993); *Metropolitan Life Ins. Co. v. Beaty*, 242 Neb. 169, 493 N.W.2d 627 (1993). Therefore, if the decree was in fact a final order, it could not have been changed by the supplemental order.

In the recent case of *Gruber v. Gruber*, 261 Neb. 914, 626 N.W.2d 582 (2001), the Nebraska Supreme Court encountered a case involving an Omaha firefighter and the division of his pension in a dissolution action. The decree of dissolution provided for a QDRO to be entered dividing the marital portion of the pension. Thereafter, the parties learned that Omaha's police and fire retirement plan did not recognize QDRO's. The wife filed an application for an order modifying the decree to provide for a supplement to the decree. The trial court's action was approved only because the modification was necessary to prevent a gross

inequity to the wife. Other courts with rules similar to Nebraska's on the finality of decrees and the inability of courts to change a decree once it has become final have encountered the problem of how to make a final order in a dissolution case and at the same time reserve to the court the power to enter a QDRO, or an order in lieu of such. The QDRO order has been held to be an enforcement device of the decree. See, *Beltrami v. Rossi*, 726 A.2d 401 (Pa. Super. 1999); *Seal v. Raw*, 954 S.W.2d 681 (Mo. App. 1997). See, also, *In re Marriage of Petraitis*, 263 Ill. App. 3d 1022, 636 N.E.2d 691, 201 Ill. Dec. 259 (1993) (appellate court found that original decree was not final order and therefore supplement was final order).

We believe a review of Nebraska case law on the meaning of a final order is necessary to resolve the issue. *Goldenstein v. Goldenstein*, 110 Neb. 788, 195 N.W. 110 (1923), throws light upon the subject of the finality of decrees in Nebraska. In that case, the trial court had entered a decree providing for a divorce, child custody, child support, and alimony. Later, upon the basis of a change of circumstances, the respondent filed an application for modification of the decree, and the trial court set aside the previously ordered allowances for alimony and child support and provided that the determination of the amounts of these allowances was reserved for future consideration. A few months later, the trial court entered an order setting the dollar amount of these allowances. At that time, the time for appealing the order setting aside the allowances had passed. The petitioner appealed the setting aside of the allowances and was confronted with the argument that the time for appeal from that order had passed. The *Goldenstein* court stated that "the nature of this order itself [the earlier order] as disclosed by its own terms, indicates that it was not, and could not be, a final order." 110 Neb. at 791, 195 N.W. at 112.

This same principle has been consistently followed in Nebraska case law. See, *Huffman v. Huffman*, 236 Neb. 101, 459 N.W.2d 215 (1990) (involving modification that did not settle all issues presented by application for modification); *Gerber v. Gerber*, 218 Neb. 228, 353 N.W.2d 4 (1984) (where appeal from divorce decree was dismissed because trial court had not decided all property issues presented); *Humphrey v. Humphrey*,

215 Neb. 664, 340 N.W.2d 381 (1983) (where dissolution was bifurcated from property settlement matters and appeal was taken after property matters were decided); *Paulsen v. Paulsen*, 10 Neb. App. 269, 634 N.W.2d 12 (2001) (order modifying decree was held not to be final and appealable because court had not disposed of all issues raised).

On the other hand, in the case of *Hoshor v. Hoshor*, 254 Neb. 743, 580 N.W.2d 516 (1998), the Nebraska Supreme Court affirmed the order of the trial court entering a QDRO when the decree provided the wife should receive one-fourth of any payments the husband received from his pension and retirement plan at the time such payment was received by the husband. The decree in the *Hoshor* case clearly settled all issues, and the QDRO was merely a method of providing the wife a means to receive what she had been awarded under the decree directly from the retirement fund administrator.

Some decrees dividing a pension are so fashioned that they dispose of all of the issues raised and therefore are final orders notwithstanding some provision for the QDRO or an order in lieu thereof. It may be that other decrees are not fashioned to dispose of all issues and therefore are not final. As the *Goldenstein* court held, the issue is to be determined by the nature of the order itself as disclosed by its terms. The question before this court in this case is whether by its terms the decree of August 6, 1999, disposed of all of the issues presented.

Paragraph 12 of the decree, which is quoted above and is the only provision in the decree that deals with David's pension, states in part that the "Petitioner shall be awarded a portion of Respondent's . . . retirement account benefits." This is the only provision in the decree dealing with the pension. Later in paragraph 12, the words "shall be" are again used, and then it states that "the Court *shall* retain jurisdiction." (Emphasis supplied.) This wording must be considered with the organization of the remainder of the 15-page decree. In all of the other paragraphs in the decree which award either party assets of the marriage, the decree uses the word "is" in contrast to the word "shall" used in paragraph 12. For example, paragraph 12 is immediately followed by an unnumbered small paragraph which provides in part: "The Respondent *is* awarded the Aetna Account." (Emphasis supplied.)

■ More importantly, paragraph 12 itself provides that the court shall retain jurisdiction for entry of the supplemental order in lieu of a QDRO. "To be final, an order must dispose of the whole merits of the case. When no further action of the court is required to dispose of a pending cause, the order is final. If the cause is retained for further action, the order is interlocutory." *Olsen v. Olsen*, 248 Neb. 393, 397, 534 N.W.2d 762, 765 (1995).

In the instant case, the trial court clearly intended to enter a final decree, except for the distribution of the pension. So by its terms, the decree did not dispose of all issues before it. The decree of dissolution was not a final order because it did not purport to presently transfer the share of the pension, but provided that the pension "shall be" divided and thus left unsettled one of the issues. The trial court retained jurisdiction to do so.

■ The Nebraska Supreme Court has said: "[I]f any substantial rights of the parties remain undetermined and the cause is retained for further action, the order, including the dissolution of the marriage, is interlocutory and not final." *Kimball v. Kimball*, 228 Neb. 702, 705-06, 424 N.W.2d 122, 125 (1988). In the *Kimball* case, the decree purported to reserve jurisdiction when there was no issue to be settled at the time of the decree although there was a possibility of an issue of property division arising in the future. The *Kimball* court held that the effect of *Humphrey v. Humphrey*, 215 Neb. 664, 340 N.W.2d 381 (1983), and *Gerber v. Gerber*, 218 Neb. 228, 353 N.W.2d 4 (1984), was to invalidate any attempt of a dissolution court to retain jurisdiction.

Since the decree was not a final order, it was an interlocutory order, and David could not have appealed from the decree. But he could and did appeal from the supplemental order, and that appeal is also an appeal from the provisions of the decree and the modifications in the supplemental order. This interpretation also disposes of the dispute over the effect of the slight difference between the wording in the decree and the supplemental order. The controlling provisions are those in the supplemental order, not the interlocutory decree entered by the trial court. See *Williams v. Williams*, 146 Neb. 383, 19 N.W.2d 630 (1945).

We are therefore concerned by the meaning and effect of the decree plus the supplemental order, and the issues before us are the meaning of the combined documents and whether the

trial court abused its discretion with respect to the division of the pension.

David's second and third assignments of error amount to arguments that the trial court abused its discretion in assigning an interest in the pension because (1) an interest in the pension as opposed to David's contribution cannot be transferred; (2) some or all of the transferred parts of the pension were not marital assets; and (3) the amount awarded to Linda was too much, because Linda will have Social Security benefits and David will not. For simplicity, we consider the last assigned error first.

*Social Security.*

David assigns as error the trial court's entering of the supplemental order, as it "unjustly enriches" Linda because she is entitled to receive Social Security benefits when she retires. Brief for appellant at 15. This issue was not presented to the trial court until the end of the April 25, 2000, hearing, and then only by an affidavit and argument of counsel. In addition to being presented too late, this assignment must fail for several other reasons. First, the division of the pension fund is merely a part of the division of the marital estate. Whether the trial court considered Linda's possible Social Security benefits in making the division of the property is unknown, but clearly if such an element should be considered in dividing property, the court would not be limited to considering it as a setoff for a particular pension fund. We point out that the record shows that David did receive an annuity worth some $98,000 and that the parties had considerable wealth, which the trial court divided without apparent complaint. Second, while we have seen cases where possible Social Security benefits have been considered for the support needed for a particular party, we are not aware of any cases where possible Social Security benefits are considered as an item of property. We do not believe they are. Furthermore, as a matter of general knowledge, it is obvious that David's right as a spouse to benefit by Linda's Social Security is a matter of federal law. We find David's argument on the issue to be without merit.

*Pension Rights Owned by David.*

David argues that the value of the pension established at trial is meaningless. He argues that Linda's share as determined in

the supplemental order is based on speculation: David's retirement date. We would express this notion differently. The record does not contain evidence of the value of the pension. We will therefore start with an analysis of the evidence relative to the pension's value.

Unfortunately, the parties did not see fit to introduce definitive information on the terms and conditions of David's pension rights. Documents and testimony do establish that David's pension fund held contributions from David of $129,284 on the day of the final hearing. David has the right to withdraw that fund only when he retires. The amount of this fund will clearly increase to some extent by his contributions after the divorce, and the information from the payroll clerk indicates it probably will also increase by accrued interest; however, we do not know the amount of these expected increases. The evidence shows that when David retires, he can either withdraw the fund then and receive slightly more than $129,284, or he can receive a monthly pension payment for life. There is no evidence that the amount contributed to this fund controls or even influences the amount of the monthly pension he will receive when and if he retires. The evidence we do have would support the conclusion that the monthly pension David will receive upon retirement is dependent upon his rate of compensation during the highest 26 pay periods of the last 5 years that he is employed.

The evidence shows that David was eligible to retire within a few months after the final hearing, several months before a final decree was entered. If he did so, the evidence shows he would receive $3,660.29 per month. We also know that this amount is determined by the amount of his average pay for the highest 26 consecutive pay periods. David testified that he will receive an already scheduled pay raise, but that otherwise, he did not have any expectations of an increase in salary. We do not know if the scheduled pay increase would have started before the date that he was eligible to retire. Except for a possibility of an increase due to an increase in pay, there is no other evidence that the amount of his monthly pension will be increased if he continues to work after the date that he is eligible to retire. We do not know if he must continue to pay into the pension fund after he reaches retirement eligibility. However, the evidence that we have would

not justify a conclusion that any contributions David makes after the date he is eligible to retire will not increase the amount of his pension except as might result from the already scheduled pay raise. We draw this conclusion from the evidence that the amount of the benefit is dependent upon the highest 26 consecutive pay periods reviewed in the last 5 years of employment.

We know that the monthly pension he will receive is not likely to go below $3,660.29 per month. The value of such pension rights are properly the subject of expert testimony, but the parties did not see fit to introduce any expert testimony. David's attorney persisted in calling David's contribution to his pension fund the *value* of the pension, which it clearly is not.

In 1 year, David would receive $43,923.48 from the monthly pension of $3,660.29. This sum is more than one-third of the $129,284 that could be withdrawn in lieu of the right to receive the monthly payment. It is obvious that the value of the pension is clearly worth a great deal more than the right to receive $129,284. By taking judicial notice of certain actuarial facts and common arithmetic, this difference becomes more startling. The difference in these values is great. The "Commissioners 1980 Standard Ordinary Mortality Table" in the appendix to the 2000 cumulative supplement to the Nebraska Revised Statutes shows that the continued life expectancy of a 50-year-old male is 24.94 years. Other tables in the appendix show a lower life expectancy, the lowest of these being 20.18 years. We take judicial notice of these common facts and conclude that at age 50, David had a continued life expectancy of at least 20 years.

In Am. Jur. 2d Desk Book, item No. 270 (1998), the annuity tables show a factor of 11.4699 that is used to determine the present worth (figured on the basis of 6 percent per annum interest) of an annual sum that will be received for 20 years. If David receives $3,660.29 each month, then annually, he will receive $43,923.48. Using these amounts and the factors from the table, the present worth of David's right to receive $3,660.29 per month for life is $503,797.92. The desk book also gives a separate table for lives of males and females. In this table, the factor for the life of a 50-year-old man is 11.3329. Using this factor with those same amounts used above would give a present value of $497,780.41 for the right to receive $43,923.48 per year for

David's expected life. Clearly, David's right to receive $3,660.29 per month for the remainder of his expected life exceeds the value of the right to withdraw $129,284 at retirement and invest it.

No one would seriously expect David to withdraw the fund he could withdraw upon retirement in lieu of the right to receive that monthly, lifetime pension. It is also easy to see why David wants to pay $63,000 cash to Linda based on the mathematics above. But a final decree must provide for a division of that lump sum in the event that he does so withdraw the entire amount. A fair distribution would seem to require a division that would consider both possibilities.

Under David's testimony, he does not expect any great increase in salary, but he does expect to get raises of unknown amounts which have already been scheduled under the fire department's existing contract. We do know that many retirement plans which pay benefits based upon the years of service plus earnings while the person is working do not require a person who has reached maximum retirement benefits to continue to pay toward the pension plan because the pensioner will not benefit from later contributions. We know that David reached retirement eligibility on October 16, 1999, but we do not know if that means he has reached maximum retirement benefits.

From independent study of the subject of pension valuation and division in dissolution proceedings in 3 Valuation & Distribution of Marital Property §§ 45.06 through 45.50 (2001); Barth H. Goldberg, Valuation of Divorce Assets §§ 9.1 through 9.5 (1984); and Brett R. Turner, Equitable Distribution of Property §§ 6.01 through 6.12 (2d ed. 1994), we conclude that David's retirement plan is what is termed a "defined benefit plan" as opposed to a "defined contribution plan," see Turner, § 6.02 at 289. The defined benefit plan has fixed or determinable benefits. *Id.* All that is known is the employee's future retirement benefits earned to date, but the valuation of such a plan requires use of experts, generally, actuaries or accountants who are highly trained and skilled in the valuation. See Goldberg, § 9.2.

The method used by the trial court in this case is called the "deferred distribution method," that is, the court makes no immediate division of retirement benefits, but determines a percentage

share which the nonowning spouse will receive when the owning spouse retires and orders that the nonowning spouse receive that percentage of every payment check which the owning spouse is entitled to receive. Turner, § 6.11 at 350. This is in opposition to the "immediate offset method" where the court determines the present value of a share in the pension of the owning spouse and immediately awards the nonowning spouse a lump-sum amount in view of that value. *Id.* at 347. The amount that David seems to maintain the court should have awarded Linda is based on the immediate offset method, but there is no evidence showing the present value of David's pension benefits. David contends Linda should be awarded only 50 percent of his contribution to the fund while married. Such an award would be patently unfair.

*Law Controlling Division of Pension Rights.*

Under Neb. Rev. Stat. § 42-366(8) (Reissue 1998), a pension is part of the marital estate. In *Reichert v. Reichert*, 246 Neb. 31, 35, 516 N.W.2d 600, 604 (1994), the Nebraska Supreme Court interpreted this statute and adopted the rule that "the marital estate includes only that portion of the pension which is earned during the marriage." In *Shockley v. Shockley*, 251 Neb. 896, 899, 560 N.W.2d 777, 780 (1997), the court stated that "[c]ontributions to pensions before marriage or after dissolution are not assets of the marital estate."

Most courts hold that if the deferred distribution method of division of a pension is used, the pension need not be valued and that the present value of the right is irrelevant. Turner, *supra*, § 6.12. This is one of the major advantages to the deferred distribution method. *Id.* We realize that this court has previously stated that it did not adopt the view that "in awarding a percentage of the pension plan it is unnecessary to determine the value of the pension fund." *Polly v. Polly*, 1 Neb. App. 121, 127, 487 N.W.2d 558, 562 (1992). However, the reason for that conclusion in *Polly* was that the value of the entire marital estate needed to be determined and considered to arrive at the marital estate for division. In this case, there is no argument that in giving Linda one-half of the marital portion of the pension, the marital estate was unfairly divided. Furthermore, in *Polly*, the possibility of early retirement created a problem of division. In

the decree, the employed spouse was required to pay the other spouse a fixed sum each month when the pension was received and not a portion of the pension that was received. The situation in this case is clearly distinguishable. It seems clear that if neither party sees fit to introduce evidence on the present worth of David's monthly pension payments, a court cannot fairly distribute the pension except by a division of a share of the marital portion of that pension.

The evidence shows that David will be entitled to at least $3,660 per month for his life when he does retire. The marital portion of that payment can be computed. If the city of Omaha is agreeable, there is no reason why one-half of the marital portion of these rights cannot be assigned to Linda and paid to her when David starts receiving his retirement benefit. The fact that Linda will receive only a right to payment when and if David retires, and then only while he lives, will affect the value of the right that the court is awarding Linda. These facts do not affect the court's ability to award her a percentage share of that right.

With the evidence showing that the amount of David's pension will depend upon his earnings for the highest 26 pay periods of the past 5 years, the evidence effectively shows the monthly pension payment can increase only slightly as a result of David's postdissolution work, that is, by the amount the city has already agreed to increase his pay by contract. The statements by the trial judge clearly indicate that he intended one-half of the marital portion of the pension rights to be assigned to Linda. David does not seem to directly dispute the reasonableness of such a division. We understand David's argument to be an assertion that in view of the attitude of the city of Omaha, the court cannot accomplish its intent, but must award Linda only a cash sum for one-half of the marital portion of the pension rights and also, that the decree does not accomplish the trial judge's intention.

In *Polly, supra,* we discussed three possible methods of valuing and dividing a pension plan upon a dissolution and stated: "The third and most widely accepted method is to determine a fixed percentage of the future benefits to be paid to the spouse, payable if and when they are payable to the owner of the plan." *Polly v. Polly,* 1 Neb. App. 121, 127, 487 N.W.2d 558, 562 (1992), citing *Bloomer v. Bloomer,* 84 Wis. 2d 124, 267 N.W.2d

235 (1978). See *Kullbom v. Kullbom*, 209 Neb. 145, 306 N.W.2d 844 (1981). We think that the trial court's intention is clearly within the power of the trial court and that such a division is reasonable and is not an abuse of discretion.

The question of whether the supplemental order followed the trial judge's announced intent can only be answered by an examination of the decree and supplemental order. Since the case law in this area is clear that the court may award Linda only a share of the marital portion of the pension, we must determine if the supplemental order entered by the trial court awards Linda contributions to the pension before the marriage or after the dissolution of the marriage.

*What Decree and Supplemental Order Purport to Give Linda.*

We will first consider the formula used by the trial court to divide the pension between marital and nonmarital interest. We will not repeat that formula because it is quoted in full above and is lengthy, but we will summarize and analyze it under evidence of this case. Simplified, Linda is to be awarded "an amount equal to the actuarial equivalent of fifty-percent (50%) of the Marital Portion of the Respondent's [David's] Accrued Benefit" under the plan "as of Respondent's commencement date, or Petitioner's [Linda's] benefit commencement date, if earlier." The supplemental order provides essentially the same, except the phrase "Petitioner's benefit commencement date" in the decree is changed to "Respondent's benefit commencement date" in the supplement. Insofar as we can determine, this change makes the phrase redundant. In addition, near the end of the portion of paragraph 12 in the decree is the phrase "as of the earlier of his date of cessation of benefit accruals or the date the Petitioner commences her share of the benefits hereunder." In the supplemental order, the word "Petitioner" is changed to "Respondent." This change has the effect of merely correcting a clear error in the decree. The decree goes on to provide that the pension shall be allocated between the parties by a supplemental decree, and the paragraph ends. There are several other provisions in the supplemental order that are not in the decree. Generally, these paragraphs are concerned with the method of accomplishing the transfer of interest, not the amount of the interest transferred. These provisions will be listed and discussed later.

The formula used in both the decree and supplemental order is patterned after what is called the "coverture fraction." 3 Valuation & Distribution of Marital Property § 45.41 (2001); Brett R. Turner, Equitable Distribution of Property § 6.10 (2d ed. 1994). Simplified, the coverture formula provides that the numerator of the fraction used to determine the marital portion is essentially the number of months of credible service of the employed spouse while married and therefore is the pension contribution *while married* and that the denominator is the total number of months that the spouse has or will be employed which resulted in the pension the employee will receive. This denominator number includes and will include the time the employed spouse worked before, during, and after the marriage. The application of that formula using the day that David would be eligible to retire (October 16, 1999) results in a determination that the marital portion of the pension is 92.5 percent of the whole pension. (See below for the computation.) Under the formula, the numerator will stay the same because the months of marriage up to dissolution will remain constant, but the denominator has the potential to increase as David continues to work after dissolution. As the denominator increases, the marital portion and hence Linda's share of future benefits will decrease. In his brief, David argues that the formula in the supplemental order will increase the marital share of the pension if David continues to work. We do not agree with this argument, because as David works after the marriage, the denominator will become larger and therefore the marital portion of the pension will be less. Under the formula, a decrease in the marital portion will necessarily occur if David works until the "earlier of his date of cessation of benefit accruals or the date the Respondent commences his share of any benefits thereunder." There is no evidence that David's monthly pension payments will increase simply because he continues to work after the date that he becomes eligible to retire, that is, October 16, 1999. The formula would protect him in case the evidence is incomplete and there are continued "benefit accruals" after the retirement date. In that respect, the formula does no harm to David, but under the evidence, such an adjustment is unnecessary.

The evidence shows that the pension is based upon David's compensation and not his contributions. The evidence shows that

the pension David will receive upon retirement will increase only if David continues to work after his retirement eligibility date and only if his postretirement compensation is greater for 26 consecutive pay periods than it was before his retirement eligibility date. The amount of the pension fund contributions could increase with continued employment if that is what the plan provides. There is no evidence that the pension would increase simply because David continues to work without receiving an increase in compensation. However, the record shows that since he will receive a scheduled, contractual pay increase, his compensation will increase by some amount if he continues to work and hence there will be some postdivorce increase in his pension. However, that increase will not be related to the length of time he works, but will depend upon his compensation's being increased. Furthermore, if the amount of his pension will increase by reason of his work after the retirement eligibility date (which is also after the dissolution date), there is reason to believe that the increase will be proportional to the length of time he is employed. Therefore, it is possible that Linda could get a benefit from David's postdivorce employment, but it might give her less, all depending upon the relationship of the amount of the pension David ultimately receives to the length of his employment. There is no indication of this relationship. It appears that the "coverture formula" does not work under the evidence in this case. The "coverture formula" has been criticized because the fraction does not take into consideration many possibilities that may exist. 3 Valuation & Distribution of Marital Property § 45.41 (2001). Since the evidence in this case is so incomplete, we cannot tell if any of the several weaknesses of the formula apply to this case.

In the case at hand, we conclude that these unfair aspects could be present, although possibly in a rather minor degree. We see no reason to affirm the use of a formula, when under the evidence, we cannot determine the effect under possible factual scenarios. In short, the formula allows for variations which may or may not be fair, depending upon the unknown terms of David's pension plan.

*Formula to Fit Evidence.*

David's retirement date, October 16, 1999, was known at the time of the final hearing held on April 19, 1999, as was the date

of the marriage, July 14, 1973, and the date David commenced his employment as a firefighter with the city of Omaha, January 1, 1972. We therefore can easily compute the marital period as 309 months and the employment period as 334 months to the date of retirement eligibility. We use the date of the final hearing, April 19, 1999, because under the procedure followed in this case, the entry of a final decree was delayed only in an effort to define what the judge intended and therefore April 19, 1999, would have been the only date available to the trial judge to compute the length of the marriage. We use the retirement eligibility date because we have the amount of benefits that David could begin receiving on that date in evidence. By dividing 334 months into 309 months, we calculate that the marital portion was 92.5 percent of the employment period that resulted in the pension. The marital portion of the $3,660.29 monthly pension David could have received if he retired on October 16, 1999, is $3,385.77 ($3,660.29 multiplied by .925) and one-half thereof is $1,692.89. Under the evidence in this case, for Linda to receive 50 percent of the marital portion of the pension, she should receive $1,692.89 from the monthly pension payment. If David's monthly pension increases from $3,660.29 per month at retirement, that increase would necessarily be due to David's postmarriage employment (except possibly for indexing which we shall separately consider).

If David continues his employment for 5 years or more after retirement eligibility, and if during the last 5 years of his employment he should receive less than he did during the period of time used to compute the pension, that is, calendar year 1998, it is possible that David's monthly pension could decrease. This unlikely eventuality can be provided for in the order by stating that Linda shall receive $1,692.89 per month or one-half of 92.5 percent of the monthly pension David receives, whichever is less. Since it might be possible for David to decrease his monthly pension by some unknown elections that pension plans frequently have, the provision for a decrease should be limited to exclude any decrease in the monthly pension resulting from any election David might make under the plan. We therefore conclude that the decree and the supplemental order should be modified to provide the following in lieu of a formula in paragraph

12 of the decree, and the related paragraph of the supplemental order should read:

That the marital portion of David's pre-414H and 414H pension is determined to be 92.5 percent of those pension rights as of October 16, 1999, and therefore Linda shall be and is awarded from David's pension fund $59,793.85 (92.5 percent of one-half of the marital portion of his contribution as of that date) if David should elect to withdraw his entire contribution to the pension. If David does not withdraw his entire contribution and becomes entitled to a monthly pension of $3,660.29 or more at retirement, Linda shall receive $1,692.89 (one-half of 92.5 percent) of each monthly payment from David's pension for the entire period that David receives such monthly pension. If the amount of the monthly pension is less than $3,660.29, then Linda shall receive one-half of 92.5 percent of the amount of each monthly payment that David is entitled to receive unless the monthly payment to David of less than $3,660.29 is a result of any election David is entitled to and does make under the pension plan. If David makes any election which has the effect of lowering the monthly benefits, then Linda shall receive from his monthly pension a monthly sum which is the actuarial equivalent of her rights absent such election. Linda is not awarded and shall not receive any other benefits, increases, or payments due David from said pension.

## Difference Between Decree and Supplemental Order.

The supplemental order states other provisions not contained in the decree. These relate to the allocation of the pension. The provisions of the supplemental order which have a bearing on the allocation of the pension provide:

6. Distributions [to Linda] shall be taxable to [her].

7. Actuarial calculations . . . shall be [done] in accordance with the Plan's actuarial assumptions. . . . [Linda] shall participate in the indexing of benefits, if applicable.

8. [Linda's] right . . . to receive a portion of the benefits and benefit rights that have accrued with respect to the Participant [David] under the Plan is hereby created and recognized.

9. An amount equal to the actuarial equivalent of fifty (50) percent of the marital portion of the vested and accrued benefits and benefit rights described in paragraph one (1) of this Order is hereby awarded to the Alternate Payee [Linda]. The amount of the Alternate Payee's benefit shall consist of fifty (50) percent of the gross amount of the marital portion of the Participant's [David's] vested and accrued benefit as of the date on which the Participant becomes eligible to receive benefits upon disability, retirement, or otherwise provided by the Plan reduced by any actuarial or other adjustments required by the terms of the Plan at the time the Alternate Payee begins receiving any benefit payments under the Plan . . . .

10. [Linda] shall . . . receive her benefits in any form available under the plan[, and she shall pay costs incurred by reason of her benefits].

11. [Linda] shall be entitled to [receive] benefits [when David] becomes eligible to receive any benefits . . . . The duration of [Linda's] benefit payment will be determined by the form of benefit selected by [David].

. . . .

13. . . . Any changes in Plan . . . shall not affect [Linda's] rights . . . .

The evidence shows that the city attorney thought that portion of the supplemental order which we quoted above, paragraph 9, gave Linda additional benefits if David continued to work. With the modifications we are making, the marital portion of the pension as determined by this court is now set and determined as a fixed percentage of a known figure, or less than that sum, and cannot be increased above that sum. Therefore, the need for this provision in the supplemental order no longer exists, and paragraph 9 of the supplemental order should be stricken.

*Indexing.*

David argues that the supplemental order allows for benefits to Linda as a result of indexing that are not part of the marital estate. However, the record shows that the city of Omaha currently does not provide indexing of benefits. Unfortunately, the record contains no definition of the meaning that the parties or the court attached to the term "indexing." Among the definitions

of the word "index," we find the word defined as "a number used to measure change in prices, wages, employment, production, etc.: it shows percentage variation from an arbitrary standard, usually 100, representing the status at some earlier time." Webster's New World Dictionary of American English 686 (3d College ed. 1988). Indexing is defined as "[a]djusting or tying wages, pensions, mortgages, or other debt issues to some measure of inflation (*e.g.*, Consumer Price Index) to preserve the purchasing power of future benefits and investment earnings." Black's Law Dictionary 771 (6th ed. 1990). Neither dictionary gives any authority for its definitions. We find no cases defining indexing. We find no evidence in the record which would establish what factors might combine to increase or decrease the pension due to inflation.

Provisions for an increase in a pension due to cost of living adjustments have been held to be passive adjustments, and when they are tied to market or other forces, then both spouses should benefit so far as the marital portion is concerned. Brett R. Turner, Equitable Distribution of Property § 6.10 (2d ed. 1994). With these definitions and authority in mind, and with the evidence showing the plan does not provide for indexing to the pension, a provision in the supplemental order stating that the "Alternate Payee shall participate in the indexing of benefits" is so broad as to be meaningless. There is no way of knowing if a form of indexing that might be adopted would be one which would only give a passive increase and therefore in which both spouses should benefit. We therefore conclude that under the evidence in this case, the provision for "indexing" should be stricken as meaningless, ambiguous, unnecessary, and possibly erroneous.

## CONCLUSION

We conclude that the formula to be used in the determination of the marital portion of David's city of Omaha pension shall be modified to read in conformity with what is outlined above, that Linda be awarded the share as described above, and that all of the last sentence in paragraph 7 and all of paragraph 9 of the decree shall be stricken.

We further realize that the provision in the order for division of the pension to be entered must be approved by the city of Omaha. We therefore provide that the trial court shall have

counsel seek approval of a supplement that is modified to comply with the terms of the modification above provided and upon receipt of such approval enter a supplemental order to enforce the division of David's pension from the city of Omaha.

For the reasons stated above, we remand with directions to modify the supplemental order in conformity with this opinion. Both parties shall pay their own attorney fees.

REMANDED WITH DIRECTIONS.