775 N.W.2d 444 (2009)
18 Neb. App. 82
Stacey L. KLIMEK, appellee and cross-appellant,
v.
Daniel D. KLIMEK, appellant and cross-appellee.
No. A-09-023.
Court of Appeals of Nebraska.
October 27, 2009.
*448 Anne M. Breitkreutz, Omaha, and Michael R. Peterson, of Hotz, Weaver, Flood, Breitkreutz & Grant, for appellant.
Jeffrey A. Wagner, Omaha, of Schirber & Wagner, L.L.P., Omaha, for appellee.
SIEVERS, CARLSON, and CASSEL, Judges.
SIEVERS, Judge.
Stacey L. Klimek filed for dissolution of her 15-year marriage to Daniel D. Klimek in the district court for Sarpy County. The district court awarded Stacey sole custody of the parties' two children, divided the marital estate, and dissolved the parties' marriage. Daniel appealed the decree of dissolution to this court. For the reasons set forth herein, we modify the decree and remand the cause for further proceedings.

FACTUAL AND PROCEDURAL BACKGROUND
Stacey and Daniel were married on July 10, 1993, and resided in Lincoln and York, Nebraska, until 1999, when they moved to Gretna, Nebraska. The parties lived in Gretna from 1999 until the time of separation. Stacey and Daniel have one son, born in April 2001, and in September 2007, they adopted a daughter, born in September 2006. Stacey has been employed in various positions with the Department of Health and Human Services during the course of the marriage. At the time of separation, Stacey was training protection and safety workers. Daniel is employed as a sergeant for the Nebraska State Patrol.
*449 In February 2008, Daniel moved out of the marital residence. Stacey filed a complaint for dissolution on February 13 in the district court for Sarpy County. In such, Stacey alleged that the marriage was irretrievably broken and sought a decree of dissolution of marriage; an equitable distribution of property; custody and control of the minor children, subject to visitation by Daniel; and child support, alimony, attorney fees, and court costs. Daniel answered, and temporary orders were issued, but such are not pertinent to this appeal.
Trial was held on August 18, 2008. The court issued its tentative findings to the parties on September 16. On December 2, Daniel filed a motion to reconsider and notice of hearing, seeking custody of the minor children because of events that took place during November that caused Daniel to be concerned about Stacey's ability to protect the children. A hearing was held on December 5, at which the court determined that the motion to reconsider was not properly brought before the court because the court had not yet issued its decree.
The court issued its decree of dissolution on December 9, 2008. The court awarded Stacey sole legal and physical custody of the minor children, subject to Daniel's regular and holiday visitation as set out in the parenting plan. The parenting plan was adopted and incorporated into the decree. The court ordered Daniel to pay $1,076 per month in child support, to pay 60 percent of the childcare and preschool expenses, to provide health insurance for the children, and to pay the first $480 of medical expenses.
The court also ordered a distribution of property. The parties were awarded any personal property or bank accounts in their own names. Stacey was awarded the 2004 Dodge Caravan, and Daniel was awarded the 1997 Dodge 1500 truck. The court ordered that the marital home in Gretna be sold and all proceeds split equally and that pending the sale, each party was responsible for one-half of the mortgage payment. Stacey was ordered to pay the following debts: the Chase account, the BP account, and the First Investors Financial Services account. These accounts totaled $24,184.99 at the time of separation. Daniel was ordered to pay the following debts: the Capital One account, the Bank of America account, and the Ambassador account. These accounts had a total balance of $33,646.77 at the time of separation. In paragraph 20 of the decree, the court awarded Stacey, as a property settlement and not as alimony, a portion of Daniel's State Patrol retirement plan, which we will discuss further in our analysis, but the court apparently treated Stacey's retirement plan as nonmarital property. On January 6, 2009, Daniel filed notice of his intent to appeal to this court.

ASSIGNMENTS OF ERROR
Daniel assigns as error the following: (1) The trial court abused its discretion in awarding Stacey sole legal and physical custody, and (2) the trial court erred in its division of the marital estate by awarding Stacey one-half of Daniel's retirement fund but failing to divide Stacey's retirement fund in the same manner. On her cross-appeal, Stacey assigns as error that the district court failed to award alimony.

STANDARD OF REVIEW
An appellate court's review in an action for dissolution of marriage is de novo on the record to determine whether there has been an abuse of discretion by the trial judge. Gress v. Gress, 271 Neb. 122, 710 N.W.2d 318 (2006). This standard of review applies to the trial court's determinations regarding custody, child support, *450 division of property, alimony, and attorney fees. Id. A judicial abuse of discretion requires that the reasons or rulings of a trial judge be clearly untenable, unfairly depriving a litigant of a substantial right and a just result. Dormann v. Dormann, 8 Neb.App. 1049, 606 N.W.2d 837 (2000).

ANALYSIS

Custody of Minor Children.
Daniel argues that the trial court abused its discretion in awarding Stacey sole legal and physical custody of the minor children. Daniel sought sole custody in his cross-complaint, but testified at trial and argues in his brief to this court that the best interests of the children require joint legal and physical custody, as was provided in the trial court's March 31, 2008, temporary order.
When custody of a minor child is an issue in a proceeding to dissolve the marriage of the child's parents, custody is determined by parental fitness and the child's best interests. Maska v. Maska, 274 Neb. 629, 742 N.W.2d 492 (2007). In the parenting plan adopted and incorporated into the decree of dissolution by the court, the parties acknowledge that both parents are fit. Such was testified to by both Stacey and Daniel at trial as well, and neither challenges the fitness of the other upon appeal. When both parents are found to be fit, the inquiry for the court is the best interests of the children. Id.
The best interests of the child require:
(1) A parenting arrangement and parenting plan or other court-ordered arrangement which provides for a child's safety, emotional growth, health, stability, and physical care and regular and continuous school attendance and progress for school-age children;
. . . .
(3) That the child's families and those serving in parenting roles remain appropriately active and involved in parenting with safe, appropriate, continuing quality contact between children and their families when they have shown the ability to act in the best interests of the child and have shared in the responsibilities of raising the child.
Neb.Rev.Stat. § 43-2923 (Reissue 2008).
Under Neb.Rev.Stat. § 42-364(3) (Reissue 2008), the court may place custody of minor children with both parents on a joint legal or physical custody basis, or both, when both parents agree to such or if the court specifically finds that joint custody is in the best interests of the minor children regardless of parental agreement or consent. When making custody determinations under § 42-364(3), if both parties do not agree, the court can award joint custody only if it holds a hearing and makes the required finding that joint custody is in the best interests of the children. See Kay v. Ludwig, 12 Neb.App. 868, 686 N.W.2d 619 (2004). The parties did not agree to joint legal custodyeach parent sought sole custody. Furthermore, Stacey disagreed with Daniel's assessment that the court-ordered temporary joint custody arrangement had been working well. The trial court did not find that joint legal custody was in the minor children's best interests.
There was evidence adduced at trial that the joint custody arrangement was not in the minor children's best interests. Stacey testified that the parties' son had been confused about the joint custody arrangement and felt as if he did not have a home. There was also considerable testimony from both Stacey and Daniel that they had a hard time communicating with one another, and communication is an essential requirement for joint custody to be successful. Therefore, we find that the *451 district court did not abuse its discretion in failing to find that joint custody was in the best interests of the minor children.
We also find that the district court did not abuse its discretion in granting sole legal and physical custody to Stacey. Throughout the marriage, Stacey had been the primary care-giver for the children, and Daniel admitted that he had spent much of his time outside the home, either working or trying to avoid fighting with Stacey in front of the children. Both Stacey and Daniel testified that each was capable of parenting the children, and the evidence adduced at trial showed that either Stacey or Daniel would be able to provide for the safety, emotional growth, health, stability, and physical care of the children. However, Stacey had taken on most of the parenting responsibilities. Stacey and Daniel both testified that the children are well-adjusted, and while Stacey admitted to struggling sometimes with disciplining their son, that certainly does not indicate Stacey lacks the requisite parenting skills to adequately care for her children. After our de novo review, we find that Daniel's first assignment of error lacks merit.

Division of Marital Estate.
Daniel also argues that the trial court erred in its division of the marital estate by awarding Stacey one-half of Daniel's retirement plan but failing to divide Stacey's retirement fund in the same manner.
The purpose of a property division is to distribute the marital assets equitably between the parties. Neb.Rev.Stat. § 42-365 (Reissue 2008); Malin v. Loynachan, 15 Neb.App. 706, 736 N.W.2d 390 (2007). The equitable division of property is a three-step process: (1) The first step is to classify the parties' property as marital or nonmarital, (2) the second step is to value the marital assets and liabilities of the parties, and (3) the third step is to calculate and divide the net marital estate between the parties in accordance with the principles contained in the statute governing division of marital property. See Sitz v. Sitz, 275 Neb. 832, 749 N.W.2d 470 (2008). We note, however, that the court did not include a balance sheet, which is typically helpful in demonstrating that the three-step process has been followed and that the division ordered comports with the applicable law. We have constructed our own table to illustrate the division of property and debts ordered by the trial court:

 Stacey Daniel
Joint checking account $ 1,000.00 $ 1,000.00
Tax refund 2,762.00
Capital One (11,844.79)
Bank of America (20,601.98)
Ambassador ( 1,200.00)
Chase ( 4,022.22)
BP ( 4,845.69)
First Investors (15,317.08)
Stacey's retirement 54,953.72
Daniel's retirement 52,072.98 52,072.99
Stacey's car 7,500.00
Daniel's car 5,000.00
Mortgage (70,579.91) (70,579.90)
Value of house 80,750.00 80,750.00
 __________ ___________
 $104,273.80 $34,596.32

The value of the marital residence, which was not factually determined by the court, was estimated at $167,000 to $169,000 by Daniel and $155,000 by Stacey. No formal appraisal was offered in evidence. In our table, we average the parties' valuations for purposes of division of the marital estate, remembering that the disposition of the residence was that it was to be immediately sold and the net proceeds divided equally.
In our table, we have also allocated 50 percent of the "Total Accumulated Contributions Plus Interest" in Daniel's State Patrol retirement account as of June 26, 2008, although we later find that the trial court's treatment of this retirement plan requires modification. But, for ease of illustration, we have allocated 50 percent of the "cash" in such plan to each party. *452 Therefore, we arrive at a total marital estate of $138,870. The trial court's division of the marital estate results in 24.9 percent to Daniel and 75.1 percent to Stacey. This division does not comport with the normal division of one-third to one-half to the spouses. See Thiltges v. Thiltges, 247 Neb. 371, 527 N.W.2d 853 (1995) (division of property is not subject to precise mathematical formula, but general rule is to award spouse one-third to one-half of marital estate). There is nothing in the evidence to justify such a marked departure from the norm, which is largely caused by the failure to include Stacey's retirement account in the marital estate to which Daniel assigns error.
However, before specifically addressing that assigned error, we discuss Daniel's retirement plana matter of concern to us preargument which resulted in an order alerting the parties of our concern. In that order, we required the filing of a supplemental transcript containing any qualified domestic relations order (QDRO) entered under paragraph 20 postdecree which has not occurred. Our basic preargument concern, which was discussed with counsel at oral argument, was whether paragraph 20 of the decree was adequate and sufficient to divide Daniel's State Patrol retirement plan. Paragraph 20, wherein the trial court dealt with such award to Stacey, as a property settlement and not as alimony, provides:
[Stacey] is awarded as a property settlement and not as alimony from [Daniel's] pension through the State of Nebraska, Nebraska State Patrol, a sum equal to 50% of [Daniel's] gross retirement benefits based on the value of [his] pension earnings as of the date of separation or an amount to be determined by the coverture method as of the date of retirement of [Daniel]. Said award shall be pursuant to a separate [QDRO] to be entered herein.
A QDRO is, generally speaking, simply an enforcement device of the decree of dissolution. Blaine v. Blaine, 275 Neb. 87, 744 N.W.2d 444 (2008).
Some details about Stacey's State of Nebraska retirement plan help illuminate our concerns about the treatment of Daniel's State Patrol plan. Stacey's retirement account with the State of Nebraska is a defined contribution plan which can be viewed as a "pot of money" that is readily divisible. And she is "100% vested," meaning that all of the money in such account is hers, or more accurately for our purposes, marital property. The evidence shows that all of such was accumulated during the marriage, and thus it is marital property to be divided. See Davidson v. Davidson, 254 Neb. 656, 578 N.W.2d 848 (1998) (as general rule, all property accumulated and acquired by either spouse during marriage is part of marital estate, unless it falls within exception to general rule). While we do not detail the exceptions referenced in Davidson, supra, none of such are applicable, and the trial court erred in excluding Stacey's State of Nebraska retirement plan from the marital estate.
However, in contrast to Stacey's plan, Daniel's State Patrol retirement account is a defined benefit planwhich can be either a "pot of money" payable in a lump sum upon retirement or termination of employment (the refund option) or an amount payable as a monthly annuity upon his retirement from the State Patrol according to the formula set forth in the State-issued "Account Statement" (the annuity option). In short, Stacey's plan is an "apple" and Daniel's plan is an "orange," resulting in material differences in benefits, and thus treatment, in a dissolution.
According to Daniel's testimony in response to questioning by the trial court, *453 the State Patrol plan uses the "Rule 75," meaning that after 25 years of service, he is eligible to retire at age 50 and draw the annuity option. Under the applicable statute, Daniel's annuity can commence as early as age 50, but if he elects the return of contributions plus interest, then he will not get the annuity. See Neb.Rev.Stat. § 81-2031 (Reissue 2008). Given that the annuity can be as much as 75 percent of his three highest 12-month periods of compensation, it is apparent that Daniel's monthly annuity payments will quickly, and greatly, exceed the amount of the contributions and interest that could be withdrawna fact that has significant implication for Daniel, but also for Stacey. The election to receive either a refund of contributions plus accrued interest or the monthly annuity is made by "the officer." See § 81-2031(2). At the time of trial, Daniel was only 40 years old and had nearly 18 years of service. Thus, assuming he continues with the State Patrol, he will be able to retire at age 50at 75 percent of his salaryignoring Stacey's rights for the moment. The value of Daniel's contributions and the accrued interest thereupon totaled $104,145.97 as of June 26, 2008, and on that date, he had 17.42 years of service.
As said, our table shows that Daniel would receive only 24.9 percent of the total marital estate under the trial court's decree. Although the division of property is not subject to a precise mathematical formula, the general rule is to award a spouse one-third to one-half of the marital estate, the polestar being fairness and reasonableness as determined by the facts of each case. Meints v. Meints, 258 Neb. 1017, 608 N.W.2d 564 (2000). Clearly, the district court's distribution would be untenable because there is nothing in the record to justify such an unequal division of property, nor is there anything to justify substantial departure from an essentially equal division.
That said, we find problems with paragraph 20 even though neither party assigns error to any aspect of the division of Daniel's State Patrol retirement plan in paragraph 20. The trial court awarded Stacey "50% of [Daniel's] gross retirement benefits based on the value of [his] pension earnings as of the date of separation." This award does not comport with the evidence, because while the parties separated in February 2008, the only value for Daniel's "contributions plus interest" was as of June 26, 2008. Although we suspect the court's intent was to award Stacey 50 percent of the contributed cash and interest as of June 26, 2008, the proper descriptor is "accumulated contributions plus interest" as used in the State-issued account statement.
Moreover, the court's use of the term "pension earnings" implies periodic payments, given that "pension" is defined as "a fixed amount, other than wages, paid at regular intervals to a person. . . in consideration of his past services." Webster's Encyclopedic Unabridged Dictionary of the English Language 1067 (1989). And, there is no evidence of the value of Daniel's "pension earnings" which the State-issued account statement references as "annuity for your lifetime" or "[m]onthly [b]enefit,"the annuity option. There is no evidence, as of the date of separation or as of any other date, of the value of such annuity option. There is only evidence of what Daniel has contributed to the plan plus accrued interest as of June 26, 2008but that is not the same as the "value of his pension," which would involve reducing his presently earned pension entitlement to present valuewhich was not done. But, because he is still working and earning benefits, the amount of Daniel's monthly annuity cannot *454 be determined because of the three variables involved in determining such: total years of service, age at which Daniel would begin receiving benefits, and "Final Average compensation," defined as Daniel's three highest 12-month periods of compensation. That said, Stacey would not be entitled to 50 percent of the monthly annuity payments, because the amount of that payment is dependent on the number of Daniel's premarital employment years, as well as his postdivorce years of service, and the amount of his post-divorce rate of pay, remembering the above-definition of "Final Average compensation," which will most likely be calculated on the basis of Daniel's postdivorce earnings. Daniel has 3 years of premarital service with the State Patrol that would be excluded from Stacey's share of the annuity payments. See Webster v. Webster, 271 Neb. 788, 716 N.W.2d 47 (2006) (only that portion of pension which is earned during marriage is part of marital estate). Thus, there are premarital years of service and postdivorce years of service that must be included in the calculation of the marital portion of the annuity option using the "`coverture fraction,'" a method of dividing a spouse's retirement plan approved in Koziol v. Koziol, 10 Neb.App. 675, 696, 636 N.W.2d 890, 908 (2001). See, also, Webster, supra. In Koziol, we explained:
Simplified, the coverture formula provides that the numerator of the fraction used to determine the marital portion is essentially the number of months of credible service of the employed spouse while married and therefore is the pension contribution while married and that the denominator is the total number of months that the spouse has [been] or will be employed which resulted in the pension the employee will receive. This denominator number includes and will include the time the employed spouse worked before, during, and after the marriage.
10 Neb.App. at 696, 636 N.W.2d at 908.
The district court's paragraph 20 references use of the coverture fraction method with respect to the annuity option available under Daniel's plan. Because of the variables earlier mentioned, and which are part of the formula, the marital portion (i.e., percentage) of the annuity payments cannot be determined in advance of when Daniel is no longer employed by the State Patrol because the denominator cannot be determined until sometime in the future. However, the numerator for the calculation can be determined because the number of months that Daniel worked for the State Patrol while married is fixed. He was working for the State Patrol when the parties married on July 10, 1993, and thus his marital contribution to his plan continued until December 9, 2008, when the parties were divorced. Thus the numerator is 185 (months), and such should be determined and included in the portion of the decree mandating the entry of a QDRO.
Although there is a definite amount for the "accumulated contributions plus interest" that we conclude the trial court intended to award to Stacey, paragraph 20 reflects the reality that there is a choice refund or annuity. The choice between the two options is Daniel's to make. Thus, how and when Stacey receives a benefit from the State Patrol plan will ultimately be determined by Daniel when he selects either the refund or annuity option.
Plain error may be asserted for the first time on appeal or be noted by an appellate court on its own motion. Worth v. Kolbeck, 273 Neb. 163, 728 N.W.2d 282 (2007). Plain error exists where there is an error, plainly evident from the record but not complained of at trial, which prejudicially affects a substantial right of a litigant and is of such a *455 nature that to leave it uncorrected would cause a miscarriage of justice or result in damage to the integrity, reputation, and fairness of the judicial process. Id.
We conclude that the trial court's treatment of Daniel's retirement account in paragraph 20 of the decree constitutes plain error. We so find because paragraph 20 does not accurately reflect the undisputed evidence about the amount of the "refund" option, and it ignores the fact that there will be delay, even in Stacey's receipt of the refund option, and equity demands that she should be compensated for such delay by an award of interest on her portion of the refund optionshould that be selected. Moreover, paragraph 20 does not provide sufficiently definite terms for the entry of a QDRO that will properly divide Daniel's State Patrol retirement plan, including the fact that it is Daniel who elects between the State Patrol plan's two options and the fact that the record establishes the numerator to be used in the coverture fraction. Finally, the trial court's paragraph 20 is defective in that it does not, as it should, award Stacey a specific percentage of the marital portion of the annuity option that will be determined by coverture fraction method. That said, it can be inferred that the trial court intended that she receive 50 percent of the marital portion of the annuity, given the trial court's direction that she receive 50 percent of what is properly designated as the refund option. Accordingly, for clarity, we find that Stacey shall receive 50 percent of the marital portion of the annuity option. Accordingly, we modify that paragraph of the decree so that it provides as follows:
Stacey is awarded, as property settlement and not as alimony, from Daniel's State Patrol retirement plan, the sum of $52,072.98, being 50 percent of Daniel's "accumulated contributions plus interest" as of June 26, 2008, together with such further interest credited to such amount by the plan until paid to her if Daniel, upon his separation from service with the State Patrol, elects the option of "refund" of contributions plus accrued interest.
In the alternative, if Daniel elects the "annuity-monthly benefit" option upon his separation from service with the State Patrol, then Stacey shall receive a monthly annuity amounting to 50 percent of the marital portion of the annuity, such to be determined by the coverture fraction method, with the numerator being 185 (months), calculated as of the date of Daniel's separation from service with the State Patrol, and the denominator of the coverture fraction shall include the total number of months of Daniel's premarital, marital, and postdivorce employment with the State Patrol. Said award and division of Daniel's State Patrol retirement plan shall be pursuant to a separate qualified domestic relations order that should be entered contemporaneously with the spreading of the mandate upon remand, but in any event, within 30 days thereafter.
As found above, the trial court erred in not including Stacey's retirement plan in the marital estate. Stacey's plan is simply a defined contribution plan and does not have an annuity or pension option, and thus its division is much less complicated than the division of Daniel's plan. There should be an equal division of Stacey's plan, as with Daniel's. Stacey's retirement account is readily divisible via a QDRO. As of July 1, 2008, Stacey's account balance was $54,953.72, and she is 100 percent vested in both her contributions and her employer's. The decree should be modified to add the following paragraph:
Daniel is awarded, as property division and not as alimony, the sum of $27,477 *456 from Stacey's State of Nebraska retirement plan, which sum shall be separated from Stacey's account and awarded to Daniel in his name alone by a qualified domestic relations order that should be entered contemporaneously with the spreading of the mandate upon remand, but in any event, within 30 days thereafter.
This modification brings the property division within the general rule to award one-third to one-half per spouse. We note that on this same day, we have released our opinion in Fry v. Fry, 18 Neb.App. 75, 775 N.W.2d 438 (2009), in which we commented upon difficulties encountered by the parties (and the courts) by delayed entry of QDRO's. Thus, in this opinion, we have, in effect, "followed our own advice" and specifically required prompt entry of the QDRO's necessary to deal with Stacey's and Daniel's retirement plans.
The parties have two joint Roth IRA accounts, one with a balance of $1,668.96 and the other with a balance of about $1,500. Stacey testified that she intended to use these accounts for their minor children and that each account had the name of one of the children included, as well as Stacey's and Daniel's names. Stacey requested that she be awarded these accounts to maintain on the children's behalf, but the trial court did not address these accounts in its decree. The evidence is that the parties intended these accounts for the use of the children. Thus, we do not include them in the marital estate for purposes of the equitable distribution of property. However, to clarify this matter, we award the accounts to Stacey.

Cross-Appeal.
Stacey argues that the district court erred by failing to award her alimony. Section 42-365 provides in part:
When dissolution of a marriage is decreed, the court may order payment of such alimony by one party to the other and division of property as may be reasonable, having regard for the circumstances of the parties, duration of the marriage, a history of the contributions to the marriage by each party, including contributions to the care and education of the children, and interruption of personal careers or educational opportunities, and the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of such party.
In considering the specific statutory criteria concerning an award of alimony, a court's polestar must be fairness and reasonableness as determined by the facts of each case. Bauerle v. Bauerle, 263 Neb. 881, 644 N.W.2d 128 (2002). A court is also to consider the income and earning capacity of each party, as well as the general equities of each situation. Millatmal v. Millatmal, 272 Neb. 452, 723 N.W.2d 79 (2006). Alimony should not be used to equalize the incomes of the parties or to punish one of the parties. Claborn v. Claborn, 267 Neb. 201, 673 N.W.2d 533 (2004).
Stacey argues that she was entitled to alimony because she was unable to attend graduate school during her marriage to Daniel. Stacey claims that Daniel wanted to start a family and discouraged her from attending graduate school, so she was not able to obtain postgraduate education, the lack of which she asserts has caused her to be passed over for promotions. However, Stacey and Daniel were married for 8 years before their son was born, and Stacey would have had an opportunity during that time to begin a *457 graduate program, well before she and Daniel started a family. Furthermore, Stacey provided no documentation to the court of what type of promotion or pay raise could have potentially resulted from her additional education. Stacey's pay stub showed that she would earn considerably more in 2008 than she had in prior years. Stacey's projected gross earnings for 2008 are $38,292, and Daniel's 2008 projected earnings are $58,587 plus any overtime or holiday pay, which for the first 6 months of 2008, amounted to $4,294. All pertinent factors considered, we find that the district court did not abuse its discretion in determining that this was not an appropriate case for an award of alimony. Stacey's assignment of error in this cross-appeal lacks merit.

CONCLUSION
We have modified the language of paragraph 20 to facilitate the entry of the required QDRO, because the paragraph was ambiguous and did not use the proper terminology, nor did it specify who had the power to make the selection between options in the State Patrol plan at the time of Daniel's end of service with the State Patrol. We have found that the trial court erred in failing to include Stacey's retirement account in the marital estate, and we have modified the decree to provide for a division thereof by a QDRO. We have clarified that the Roth IRA's are awarded to Stacey. We have found that the trial court did not err in denying Stacey alimony. In all other respects, we affirm the trial court's decree.
AFFIRMED AS MODIFIED, AND CAUSE REMANDED FOR FURTHER PROCEEDINGS.