IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

MATSCHULLAT V. MATSCHULLAT

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

KRISTOPHER E. MATSCHULLAT, APPELLANT,

V.

DANIELLE MATSCHULLAT, APPELLEE.

Filed June 20, 2017.    No. A-16-1058.

Appeal from the District Court for Holt County: MARK D. KOZISEK, Judge. Affirmed.

Bergan E. Schumacher, of Bruner Frank, L.L.C., for appellant.

James D. Gotschall, of Strope & Gotschall, P.C., L.L.O., for appellee.

MOORE, Chief Judge, and PIRTLE and BISHOP, Judges.

BISHOP, Judge.

## INTRODUCTION

Kristopher E. Matschullat and Danielle Matschullat were divorced in 2010. In 2015, Kristopher filed a complaint in the district court for Holt County seeking to modify custody of the parties' children from Danielle's sole legal and physical custody to joint legal and physical custody. The district court declined to modify custody, but did modify the parties' parenting plan to increase Kristopher's alternating weekend parenting time. Relevant here, the court also modified summer parenting time, a telephone contact provision, and child support; Kristopher appeals and assigns error to these modifications, as well as the denial of joint custody. We affirm.

## BACKGROUND

A decree entered July 12, 2010, dissolved the parties' marriage, and awarded them joint legal and physical custody of their minor children, Sierra, born in 2002, and Austin, born in 2007. No child support was ordered to be paid by either parent based on their incomes and the application

- 1 -

of a joint physical custody child support calculation. A few months later, on October 20, 2010, Danielle filed a "Complaint for Modification of Decree," claiming a material change of circumstances based upon Kristopher's: refusal to communicate in a civil manner; failure to provide any financial support; behavior towards her; failure to fully exercise parenting time; and disruptive demands for parenting time with little or no advanced notice. An "Order Modifying Decree" was entered November 29, 2011, and it approved a written settlement agreement reached by the parties. The modification order awarded Danielle sole legal and physical custody of the children. Kristopher was awarded parenting time every other weekend from Friday afternoon to Sunday night during the school year. During the summer, the parties alternated parenting time on a weekly basis commencing each Friday night. Holidays were also alternated between the parties. The parent not in possession of the children was only allowed telephone contact during the summer during "reasonable times and intervals, not to exceed two calls per week," except in emergency situations. Additionally, Kristopher was ordered to pay $600 per month in child support.

On December 15, 2015, Kristopher filed a "Complaint for Modification." He claimed a material change in circumstances had occurred since the November 2011 modification order, namely, that: the parties were able to communicate and co-parent the children; Kristopher had been exercising parenting time in excess of the last order; the children were of sufficient age and maturity and desired more time with their father; Kristopher had remarried, creating a stable home environment; his job changed allowing him more flexibility to co-parent and be more involved with the children; and he was a stable, secure, and appropriate parent to be awarded joint legal and physical custody.

Danielle's "Answer" denied the allegations of Kristopher's complaint, and further asserted that Kristopher had been charged with criminal assault upon Danielle in the presence of one of the children, and tampering with a witness; she claimed he served 21 days in jail. Danielle also alleged that since the entry of the last modification order, Kristopher told the children they were not welcome at his home in mid-July 2012 but changed his mind later in August; this occurred again from September to November 2013. Danielle asserted there had been no material change in circumstances.

Trial was held on August 3, 2016; Sierra was 14 years old and Austin was 8. The evidence from trial will be discussed in the analysis of Kristopher's assignments of error. The district court entered an "Order Modifying Decree" on October 12. In first reviewing whether a material change in circumstances had occurred since the last modification order in November 2011, the court concluded the following changes alleged by Kristopher did not constitute a material change based upon the evidence presented: improved communication between the parties, increased parenting time by Kristopher beyond the time specified in the parenting plan, Kristopher's remarriage, and more flexibility in Kristopher's work schedule. The court concluded that those reasons neither "individually, nor collectively" met the test for establishing a material change. However, the children's wishes "cause[d] the court its greatest concern." The court noted that previous custody arrangements had been made pursuant to the stipulation of the parties. Citing to Neb. Rev. Stat. § 43-2923(5) (Reissue 2016) (best interests of the child requirements; subpart (5) calls for ensuring "the child's voice is heard and considered in parenting decisions"), the court observed:

> If the child's voice is to be heard . . . it would seem that the court must consider a child's desires and wishes when they reach the age of comprehension. Otherwise,

consideration of a child's desires and wishes would be controlled solely by their age at the time their parents divorce, and if too young, their desires and wishes could never be considered, absent some other material change. Such a limitation does not allow the court to consider a child's best interests as they evolve over time.

The district court concluded that Sierra's desires and wishes represented a material change in circumstances. The court stated that § 43-2923(6)(b) requires consideration of the desires and wishes of a child who is of an age of comprehension and when based on sound reasoning. However, citing to *Vogel v. Vogel*, 262 Neb. 1030, 637 N.W.2d 611 (2002), the court also noted that "the wishes of a child are not controlling in the determination of custody, if a child is of sufficient age and has expressed an intelligent preference, the child's preference is entitled to consideration." The court concluded that Sierra had no manipulative or other agenda, she "simply wants to spend more time with her dad." Danielle, "with no real explanation, thinks the children's time with their dad should be limited to the time provided for in the Parenting Plan, subject to her determination that additional time be allowed." The court found that Sierra was maturing and was "able to make observations of those things going on about her and form her own conclusions. It would be a shame if she were to conclude that her mother is unreasonable to the extent that their relationship is negatively impacted."

Having concluded a material change in circumstances existed, the court then evaluated whether the best interests of the children required a change in the custody arrangement. The court did not change legal or physical custody, but did modify the parenting plan to increase Kristopher's alternating weekend parenting time from 2 days to 4 days commencing on Wednesday evening and concluding on Sunday evening in every 14-day block of time (a 10/4 schedule). The modified parenting plan alternated holidays and gave Kristopher four continuous weeks during the summer, with Danielle permitted one weekend from Friday to Sunday evening during that time. Also, pertinent to this appeal, the modified parenting plan provided for the parents to have telephone contact with the children each Wednesday, between 6 p.m. and 9 p.m., for not less than 15 minutes per child.

Kristopher timely appealed the district court's October 12, 2016, modification order.

## ASSIGNMENTS OF ERROR

Kristopher assigns that the district court erred: (1) by failing to grant him joint custody; (2) by reducing his summer parenting time; (3) by limiting his telephone contact with the children; and (4) in calculating his child support obligation.

## STANDARD OF REVIEW

Child custody and parenting time determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. See *State on behalf of Maddox S. v. Matthew E.*, 23 Neb. App. 500, 873 N.W.2d 208 (2016).

An abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id*. A judicial abuse of discretion requires that the reasons or rulings of the trial court be

clearly untenable insofar as they unfairly deprive a litigant of a substantial right and a just result. *Id*.

In child custody cases, where the credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Id*.

ANALYSIS

Kristopher raises four issues on appeal stemming from the October 12, 2016, modification order: denial of joint custody, reduced summer parenting time, limited telephone contact, and incorrectly calculated child support. As noted above in the standards of review section, the district court's decision on such matters will be affirmed absent an abuse of discretion. Therefore, unless the district court's decisions on these matters are untenable or unreasonable or are so clearly against justice or conscience, reason, and the evidence, this court must affirm.

*Denial of Joint Custody*.

In his effort to obtain joint legal and physical custody, Kristopher offered evidence that communications between Danielle and him had improved since the last modification. Kristopher also indicated that he had made changes to his life. Kristopher sought a "week on/week off custodial arrangement" to allow the children adequate time with both parents. Brief for appellant at 5. The district court concluded that the evidence supported increasing Kristopher's parenting time with the children, but the court chose not to change the past custody arrangement. Our de novo review of the record reveals the following.

Kristopher testified that he and Danielle have a different relationship now than six years ago. In November 2011 (time of last modification), Kristopher said he and Danielle "could not find a way to work things out." It "was hard to communicate[,]" and there were "just so many emotions involved then." Kristopher claimed his ability to co-parent has changed since then. He no longer has hard feelings towards Danielle, and he values her relationship with the children. Kristopher said they can effectively communicate and co-parent; as an example, he talked about how they were able to make a lot of changes for the summer as a result of activities going on, and they effectively made those changes "so that it worked out for everybody." Kristopher also described having Danielle come out to his residence to see Sierra work with her horse. Kristopher also submitted as evidence emails and text messages between himself and Danielle to support their ability to communicate.

Kristopher testified that he owned Sierra Trucking, which hauls "ag-related products" locally and regionally. He is in charge of his own schedule, so when he has the children, "the other guys drive for [him]" and he spends time at home "working on trucks" and "doing office work." Kristopher said that when the children are in his care, he will not drive for work at all; rather, he will work from home. He is financially able to support the children, and he produced evidence of accounts in a college savings plan for both children. Kristopher lives in the home in which the children were born. It is located outside of Page, Nebraska, which Kristopher said is 9 miles from O'Neill, Nebraska, where Danielle resides. If awarded joint custody, Kristopher said he would transport the children into O'Neill for school because that is where they have been attending school.

Kristopher testified that Sierra is "a very, very smart kid; she works really, really hard." Also, she loves animals and has a "really, really big heart." She makes good decisions, understands their consequences, and she is "honest and straightforward." Kristopher said that he and Sierra are very close, and that he is her confidant; "she looks to [him] for security." Kristopher thought Sierra's relationship with Danielle would improve if the court granted a joint custody arrangement because there is a "lot of conflict between Sierra and Danielle . . . over Sierra getting to spend time with [Kristopher]."

As for Austin, Kristopher described him as having "a beautiful heart." He said that Austin "loves his video games" and he is "all about his super heros[.]" They play video games together, and Austin likes going in the truck and "hauling cattle."

Kristopher testified that both children are "extremely good kids." He and the children spend a lot of time at home since "they have a lot of stuff to take care of around there[.]" Sierra has her horses, so they spend a lot of time doing that. They have also gone to the lake and did some boating occasionally in the past. They cook together, enjoy family meals together, and have daily household chores. They go on bike rides frequently and walk the dogs in the evening. Kristopher said the children are always happy when they spend time with him; "[t]hey smile and laugh a lot and joke around, and wrestle and play and they just seem - they just seem happy." Kristopher testified that he would be supportive of the children's education, activities and social life, and that he could meet their needs, including medical needs related to their allergies.

Kristopher remarried in May 2015. His wife, Keri Matschullat, likes playing games with the children, as well as reading and writing with them. She loves animals. According to Kristopher, "Sierra respects Keri a lot. They're both very kind to each other." Keri also plays video games with Austin. When Keri is at work, both children want to know when she will come home. Kristopher believed both children benefitted from having Keri in their lives.

On cross-examination, Kristopher admitted that he had previously hit Danielle (in July 2010), that "it was a very tough time[,]" and they "argued and fought a lot." Kristopher acknowledged his conviction for the assault, as well as for criminal tampering with a witness (also 2010). On redirect, Kristopher explained that he has changed since that time. He "found [his] faith," and he believed he and Danielle have a different relationship now.

Kristopher acknowledged that in April 2016, he called a police dispatcher and asked for a welfare check at Danielle's home to make sure Danielle and Sierra were okay. He said that Sierra was communicating with him, "and then it just stopped." Sierra had communicated that she wanted Kristopher to come and get her "right now." With regard to this incident, Danielle testified that Sierra "was worried about the next weekend," and she was sending emails to Kristopher expressing her concern about waiting two weeks "and then not be able to see her horses." Kristopher messaged Danielle, and Danielle told him that Sierra was upset about the conversation they had about the horses, and about missing a musical. Kristopher wanted to come and get Sierra, but Danielle told him no, and that she was not going to argue about it. Danielle turned the ringer off her phone and went to bed. Danielle said the police arrived after 11 p.m., and that Kristopher had requested they check to make sure Sierra was okay. Sierra talked with the officer, but "[s]he was really worried about it; she was kind of crying and she wouldn't take the blanket off of her head." This incident was discussed by Danielle in the course of her testimony regarding examples of Kristopher undermining her parental authority.

In addition to Kristopher's testimony, five other witnesses testified on his behalf. Dwight Trowbridge testified that he and Kristopher had been friends for 15 to 20 years, and Kristopher "is married to [Trowbridge's] niece and he is part of our family." Trowbridge was recently employed by Kristopher as a contract driver to drive one of Kristopher's trucks. Trowbridge said that Kristopher coordinates his driving schedule around his children, and he is "a very loving father. His children seem to love him back as much." He has observed Kristopher and the children to have a close relationship, and noted that Kristopher and Keri are "[a] very loving couple[,]" and set a good example for the children.

Matthew Sobotka testified that he has his own trucking business and he and Kristopher share work; Sobotka keeps his trucks at Kristopher's house. There was "no doubt in [Sobotka's] mind" that Kristopher would arrange his trucking schedule around his children if he were awarded joint custody. Sobotka said Kristopher was a "good dad," and a "good person to be around and to work with." Sobotka goes to the same church as Kristopher, and stated that Kristopher instills "Christian values" in the children. Sobotka had positive observations regarding Kristopher's and Keri's relationship with the children.

Alexander McCleary, Kristopher's "half brother," works for Rock County Public Schools as a high school math teacher and as a coach for various sports. He also testified favorably about Kristopher's parenting and his relationship with the children. He talked about Kristopher having three horses and Sierra's riding lessons, and how Kristopher has pushed Sierra "to do something that she's good at." McCleary said that as a teacher, he has seen "plenty of kids" whose parents have "split up," and "the ones that you can really see flourish are the ones that both parents are active and equally engaged in their lives."

Kendra Jackson works as the manager of the Holt County Animal Shelter and also cleans homes. She has been cleaning Kristopher's home for a couple of years. Jackson testified about her observations at Kristopher's home. She said that Kristopher is a good father, that he is "very aware of everything and of the kids' feelings . . . especially for Sierra being a teenager . . . he's there[,]" and "[h]e listens." In addition to speaking favorably about Kristopher's parenting and his bond with the children, Jackson also described Kristopher's home as "family-oriented" and "homey."

Kristopher's wife, Keri, works at the front desk of the Holiday Inn Express in O'Neill, and also works as a family mediator. She and Kristopher were married in May 2015, but had been together for five years prior to that. They do not have children together, but Keri testified that Sierra and Austin are both comfortable with her. They do family things together like boating and swimming, and they also work together doing "household stuff" and work "that needs to be done outside and in the barn[.]" Keri said they got Sierra into riding lessons so she can be better and more responsible around them, and although Austin prefers being inside, he does play with the dogs in the yard. Keri stated that her relationship with Kristopher was strong and that Kristopher is "a really good man." Keri indicated her support of Kristopher having joint custody of the children, and noted that he has "amazed [her] on numerous occasions with how he handles things with the kids." Keri said the children have a more difficult time leaving at the end of Kristopher's parenting time during the school year than the summer, that "they miss their dad when they don't see him enough."

Danielle testified; no other witnesses were called on her behalf. Danielle lives in O'Neill, and she also remarried. She testified that she is employed by McKinney Furniture, a family

business, and she also works as an "EMT." She can also work as a substitute teacher, but she does not do that often. Danielle agreed that the children were well-behaved, loving, and hard workers. She described their routine during the school year, and explained why she opposed joint custody. She said the children have "a good structure, good routine. It's been that way their entire lives with me. . . . I believe I have the structure and just a better - better scenario for them to be in." Danielle testified that the children have a good relationship with her current husband.

Danielle said there was about a 6-week period in the summer of 2012 when Kristopher did not fully exercise his parenting time, as well as a 2-month period in the fall of 2013. (On cross-examination, she acknowledged that Kristopher had exercised all of his parenting time in 2014, 2015, and 2016, and had asked for additional parenting time.) Danielle also testified that Kristopher undermines her authority over the children (such as the April 2016 incident described previously), and that on "[s]everal occasions he's tried to talk about things and I say I don't think it's a good idea and he does it anyway." Danielle stated that when the children return from spending time with Kristopher, they are usually "somewhat defiant and they just don't want to cooperate with anything I say."

Austin did not testify, but Sierra testified in camera, with counsel for both parents present while the court asked questions. The testimony was sealed, and will therefore not be discussed in detail here. In its modification order, the district court stated that based upon its interview with Sierra, "there is no question Sierra desires to spend more time with her dad." The court observed that 2 out of 14 days "is not enough[,]" and Sierra "is fully engrossed in her horses. . . . [and] wants to spend more time with them." The court found these to be "sound reasons."

In its modification order, the court made a number of specific findings with regard to parenting by Danielle and Kristopher. The court pointed out the good job Danielle had done parenting the children, stating, "They are good wholesome children and would not be that way without Danielle's parenting. One cannot discount the impact she has had on the children. Her continued substantial involvement with the children is necessary." The court did express concern that Danielle's hostility towards Kristopher was "not lost on Sierra[,]" and while it "may be justified, it would be better that [Danielle] not show and accent her feelings in front of the children."

The district court addressed Kristopher's conviction for assaulting Danielle in 2010, noting that there was "no evidence that the abuse was of a recurring nature[,]" and, although not condoning such behavior, the court stated that it "seemed to have been a product of the marital break-up." The court observed that Kristopher and Keri "appear to be doing a very good job of providing a home for the children. They are appropriately engaged with the children, providing social and educational opportunities through family living."

In summary, the district court stated in its order:

Relationships between people are seldom static. There is a certain ebb and flow, especially when children are involved. In a better world, divorced parents would converse, discuss and make decisions based upon their children's best interests.

The court considers the request to modify and the reasons for the request. Sierra is maturing and wants to be able to spend additional time with her dad. Two days every two weeks is insufficient. While the parties have had problems in the past, the evidence pointed to a strong relationship between Sierra and Kristopher and because of that strong

relationship, Sierra wants more time with her dad. Sierra's best interests require that the Parenting Plan be modified.

Keeping the evidence and the court's findings in mind, we now consider the legal principles governing custody and parenting time matters. When deciding custody issues, the court's paramount concern is the child's best interests. *Citta v. Facka,* 19 Neb. App. 736, 812 N.W.2d 917 (2012). Section 43-2923(6) states, in pertinent part:

In determining custody and parenting arrangements, the court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of the foregoing factors and:

(a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;

(b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;

(c) The general health, welfare, and social behavior of the minor child;

(d) Credible evidence of abuse inflicted on any family or household member. . . . and

(e) Credible evidence of child abuse or neglect or domestic intimate partner abuse. . . .

Other pertinent factors include the moral fitness of the child's parents, including sexual conduct; respective environments offered by each parent; the age, sex, and health of the child and parents; the effect on the child as a result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and parental capacity to provide physical care and satisfy educational needs of the child. *Robb v. Robb,* 268 Neb. 694, 687 N.W.2d 195 (2004).

Relevant to joint custody, we note that the Parenting Act defines "[j]oint legal custody" as "mutual authority and responsibility of the parents for making mutual fundamental decisions regarding the child's welfare, including choices regarding education and health." Neb. Rev. Stat. § 43-2922(11) (Reissue 2016). And "[j]oint physical custody means mutual authority and responsibility of the parents regarding the child's place of residence and the exertion of continuous blocks of parenting time by both parents over the child for significant periods of time." § 43-2922(12). We acknowledge that courts typically do not award joint legal custody when the parties are unable to communicate effectively. See, *Kamal v. Imroz,* 277 Neb. 116, 759 N.W.2d 914 (2009) (joint decisionmaking by parents not in child's best interests when parents are unable to communicate face-to-face and there is level of distrust); *Klimek v. Klimek,* 18 Neb. App. 82, 775 N.W.2d 444 (2009) (no abuse of discretion by district court's failure to award joint custody when minor child was confused by temporary joint legal and physical custody arrangement and parents had hard time communicating with one another). However, a trial court's decision to award joint legal or physical custody can be made without parental agreement or consent so long as it is in the child's best interests. Neb. Rev. Stat. § 42-364(3) (Reissue 2016) states:

Custody of a minor child may be placed with both parents on a joint legal custody or joint physical custody basis, or both, (a) when both parents agree to such an arrangement

in the parenting plan and the court determines that such an arrangement is in the best interests of the child or (b) if the court specifically finds, after a hearing in open court, that joint physical custody or joint legal custody, or both, is in the best interests of the minor child regardless of any parental agreement or consent.

Based on the evidence, the court's findings, and the foregoing legal principles, we cannot say that the district court abused its discretion by declining to modify legal or physical custody. With regard to Kristopher's request for joint legal custody, there is evidence that Kristopher has made commendable efforts to improve communication between Danielle and himself; however, there is also evidence of ongoing tension and distrust. One example was the April 2016 welfare check incident. Additionally, at the conclusion of trial, after commenting on Danielle's observed hostility during her testimony, the court stated, "And so to say that we have a good relationship and we're able to communicate well, I'm not sure that that's actually the case." Further, in its order, the court specifically pointed out the good job Danielle had done parenting the children, noting that they were "good wholesome children" who "would not be that way without Danielle's parenting." The court stated, "One cannot discount the impact she has had on the children. Her continued substantial involvement with the children is necessary." Given the court's observations and the evidence in this record, we cannot say it was an abuse of discretion for the court to decline modification of legal custody.

With regard to joint physical custody, the court did find that "Sierra wants to spend more time with her dad." The court said that the "focus ought to be on what is best" for the child, and if more time makes the child happy, "then don't use a piece of paper to govern how you allow your child to interact with her dad." The court expressed frustration that parents use a parenting plan "as a weapon" instead of truly thinking about what would benefit their children. The evidence did show that Danielle made some additional parenting time available outside the parenting plan, but perhaps more on her own terms than upon Kristopher's or Sierra's request. Therefore, to facilitate more scheduled parenting time, the court increased Kristopher's parenting time from a "12/2" schedule to a "10/4" schedule in each 14-day block of time. While this falls short of the "7/7" alternating weekly schedule Kristopher would have preferred, the evidence demonstrated that the children were happy and doing well in school with their current living arrangement and the structure provided in Danielle's home and under her primary care.

Finally, like the district court, we find it troubling that Sierra is aware of the tension between her parents, especially with regard to the allocation of parenting time. This is the one big negative that stands out amidst a lot of other very positive parenting by each parent. Whether by nonverbal cues, or comments made directly to the children, or statements made by the parents or other family members in the children's presence, both parents need to focus on the best interests of their children rather than the personal grievances between each other. As evident in this case, when children mature, their relationships with their parents evolve, and each parent should be supportive of the children's interests and needs in that regard. At this time, those needs included increasing the parenting time between Kristopher and Sierra. The district court determined that this need could be best met by increasing Kristopher's alternating weekend parenting time rather than changing the legal or physical custodial arrangement. The court's decision is supported by

the record, and is not unreasonable or so clearly against justice as to constitute an abuse of discretion.

*Reduced Summer Parenting Time.*

Kristopher argues that "despite the evidence presented at trial," the court "took away at least two full weeks of parenting time Kristopher previously had with his children for no apparent reason." Brief for appellant at 6. Prior to this most recent modification order, Kristopher and Danielle alternated summer parenting time on a weekly basis. The new summer schedule gives Kristopher four continuous weeks during the summer, with Danielle permitted one weekend from Friday to Sunday evening during that time.

Although the court did not articulate a specific reason for this change to the summer schedule, the evidence supports the decision from at least a couple of standpoints. First, an extended period of continuous parenting time will allow Kristopher and the children to enjoy the benefits of a more "full-time" familial environment, as well as the expectations and responsibilities associated with that kind of extended daily contact. And although the new summer plan may result in a week or two less overall time, the children having a continuous 4-week period immersed almost solely into Kristopher's home environment and routines should result in a richer experience for Kristopher and the children. Additionally, the children's extended time away from Danielle's home may help her better appreciate parenting from a noncustodial parent's viewpoint, and perhaps this will encourage more flexibility and sharing of parenting time beyond the court-ordered time.

Finally, although there may have been some reduction in overall summer parenting time for Kristopher, the parenting time gained during the rest of the year was significantly more than was lost during the summer. The evidence supports the court's decision to concentrate Kristopher's summer parenting time with the children into four consecutive weeks rather than making the children go back and forth between households every week for the entire summer. The summer parenting time modification was not untenable or unreasonable, especially in light of the considerable parenting time gained by Kristopher during the rest of the year. The district court's decision to modify summer parenting time was not an abuse of discretion.

*Limited Telephone Contact.*

We first consider the telephone provision from the November 2011 modification order. It stated, "Parents shall not have telephone parenting time with the children during visitation, except during the summer when the noncustodial parent shall be allowed to visit with the children at reasonable times and intervals, not to exceed two calls per week," except in emergency situations. Whereas, the October 2016 modification order stated, "The parents shall have telephone parenting time with the children on Wednesday each week, between 6:00 p.m. and 9:00 p.m. for not less than fifteen (15) minutes per child." Kristopher argues that this provision unreasonably restricts his telephone contact, and that it "would be far more rational to allow for daily telephone contact with the children." Brief for appellant at 21. Kristopher says that providing for more telephone time "would certainly benefit Sierra, as she could freely speak to her father without fear of getting into trouble." *Id.*

While we certainly agree that Sierra should be able to speak freely by telephone with her father at reasonable times, we do not read the challenged provision to restrict that ability. The November 2011 telephone provision clearly prohibited telephone contact other than during the summer parenting time and emergencies, as noted. However, the October 2016 modification order no longer contains such a restriction. Rather, it simply provides for each parent to have a guaranteed opportunity to speak with the children by telephone at least once per week when the children are with the other parent. It does not prohibit telephone contact between the children and their parents at other times; further, we note that Sierra's primary method of communication with her father seemed to be through emails or texting, and the challenged provision places no restraints on that kind of communication. Both parents should, of course, discourage unreasonable or excessive telephone or other electronic communications during the other parent's parenting time so as to not compel the need for a more restrictive provision. We find no abuse of discretion by the district court in its decision to modify the telephone provision to a more relaxed and flexible standard than previously ordered.

*Incorrectly Calculated Child Support*.

Kristopher's child support obligation was increased from $600 to $898 per month. He claims that in the event this court does not reverse the custodial order, which we have not, that the child support calculation "must be fixed" to comply with the Nebraska Child Support Guidelines. Kristopher's entire argument as to this assigned error follows:

> The computation by the District Court is incorrect as a result of what appears to be a clerical error. The Court erred in incorrectly computing the parties' taxes, thus affecting the parties' monthly net income, and thereby affecting each parent's monthly share of child support. The District Court should have checked the box that Kristopher is self-employed, per the evidence and testimony received at the time of trial. [Citation to record omitted.] Failure to compute Kristopher's child support correctly necessitates this Court's responsibility to fix the error on the calculation.

Brief for appellant at 21.

As noted by Danielle in her brief, it is unclear what Kristopher means with regard to a clerical error and an unchecked box related to Kristopher's self-employment. In its modification order, the district court specifically discussed Kristopher's self-employment. The court further noted that it had been "promised additional testimony" explaining a depreciation exhibit, but "[i]t was not provided." The court then detailed how it arrived at an income of $36,302 ($3,025 per month) for Kristopher, and that figure was used on the attached child support worksheet. (We note that this is the same gross income amount proposed by Kristopher in exhibit 19; the amount of tax and FICA deductions differ.) There is no box to be checked on the court's worksheet, and Kristopher does not provide any further explanation as to why the figures used by the court are in error. Without more information, this court would have to engage in speculation, and we decline to do so. Accordingly, we cannot say the court abused its discretion in the income attributed to Kristopher, nor in the court's child support calculation.

## CONCLUSION

Having found no abuse of discretion in the district court's October 12, 2016, modification order, we affirm.

AFFIRMED.