IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


Vlasak v. Vlasak


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


Brian J. Vlasak, appellee,

v.

Jacqulyn M. Vlasak, now known as Jacqulyn M. Craig, appellant.


Filed March 13, 2018.    No. A-17-207.


Appeal from the District Court for Douglas County: Thomas A. Otepka, Judge. Affirmed as modified.

Jeff T. Courtney, P.C., L.L.O., for appellant.

Justin A. Roberts, of Lustgarten & Roberts, P.C., L.L.O, for appellee.


Moore, Chief Judge, and Riedmann, Judge, and Inbody, Judge Retired.

Moore, Chief Judge.

## I. INTRODUCTION

Pursuant to a decree of dissolution, Jacqulyn M. Vlasak, now known as Jacqulyn M. Craig, and Brian J. Vlasak were awarded joint legal and physical custody of their minor child. Subsequently, the parties sought to modify custody and Jacqulyn sought to remove the child from Nebraska to Nevada. Brian also filed a contempt action with respect to Jacqulyn's failure to pay certain childcare expenses. The district court for Douglas County denied Jacqulyn's request for removal and modified the decree to award physical custody to Brian. The court also denied Brian's application for contempt. Jacqulyn appeals, and Brian cross-appeals. For the reasons set forth herein, we affirm as modified.

- 1 -

## II. BACKGROUND

The parties were married in July 2005. In March 2008, they adopted their daughter, Hailey, when she was 2 days old. The parties were divorced in October 2009. The decree awarded them joint legal and physical custody of Hailey. The court ordered Brian to pay Jacqulyn child support of $168.18 per month. The parties agreed to a parenting plan that was incorporated into the decree. Under the parenting plan, Jacqulyn had parenting time with Hailey every week from 8 a.m. Monday to 8 a.m. Wednesday; Brian had parenting time every week from 8 a.m. Wednesday until 8 a.m. Friday; and the parties alternated parenting time from 8 a.m. Friday until 8 a.m. Monday each week. The parenting plan provided each of the parties with "the right of first refusal" to provide care for Hailey during the other parent's parenting time "if the minor child requires any amount of care." The court ordered each party to pay 50 percent of childcare expenses incurred by either party due to the parties' employment or education. The party incurring the expenses was to provide receipts to the other party within 30 days of the expenses being incurred and the other party was to make payment of 50 percent of the costs within 30 days of receiving the receipts.

Both parties remarried following their divorce. Brian married Kristen Vlasak in May 2014. He and Kristen have a child together, who was 19 months old at the time of the modification trial. Jacqulyn married James Craig in December 2011. Jacqulyn and James have a child together, who was 3 years old at the time of trial. James also has children from a previous marriage, who were ages 18, 15, and 12 at the time of trial.

On March 9, 2016 Jacqulyn filed a complaint for modification and removal from the jurisdiction, seeking to modify physical custody and to remove Hailey from Nebraska to Las Vegas, Nevada. She alleged that since entry of the decree there had been material and substantial changes in circumstances warranting modification. Specifically, she alleged that James, a Federal Bureau of Investigations (FBI) special agent currently assigned to the Omaha, Nebraska Division, was being transferred to the Las Vegas Division in May; that although the parties had been awarded joint physical custody, she had remained Hailey's primary care giver; and that Hailey's hygiene needs were not being met when she was in Brian's physical possession. Jacqulyn asserted that the parties should continue to have joint legal custody, but she asked the court to award her primary physical custody. She also alleged that it was in Hailey's best interests to allow Jacqulyn to remove her from the jurisdiction.

Brian answered and filed a counterclaim, in which he sought sole legal and physical custody of Hailey. Brian alleged that there had been a material and substantial change in circumstances warranting modification of custody in that Jacqulyn intended to relocate to Las Vegas because of James' transfer and that Jacqulyn does not communicate with Brian in a business-like manner, has used excessive vulgar language, and joint custody is no longer workable.

In May 2016, Jacqulyn relocated to Las Vegas with James and their blended family, except for James' oldest child who had graduated from high school and remained in Omaha with her mother. Hailey remained in Omaha with Brian. On May 18, the district court entered a temporary order, awarding Brian temporary primary possession of Hailey until further order of the court. The court awarded Jacqulyn summer parenting time with Hailey in Las Vegas from July 1 to August 10.

On May 31, 2016, Brian filed an application for an order to show cause, alleging Jacqulyn should be held in contempt due to her failure to reimburse Brian for childcare costs incurred on behalf of Hailey.

Trial on all matters was held before the district court on September 7 and 8, 2016. Jacqulyn testified on her own behalf and presented testimony from her brother, her parents, and James. Brian testified on his own behalf and presented testimony from one of Hailey's teachers, his father, and Kristen. The court received various documentary, photographic, and other exhibits.

James has a bachelor's degree in business information systems, a master's degree in management, and at the time of trial, he was a student at a law school "on track to get a master's in legal studies." James is employed as a special agent for the FBI. He began working for the FBI in August 2005 in Omaha as an information technology specialist. In August 2008, he underwent training and became a special agent, assigned to the Omaha division as a counterterrorism agent, where he also worked in cybercrime. James testified that if he had remained "a cyber agent" in Omaha, he would not have advanced. In 2014, James began training to become a technically trained agent, which he described as "another opportunity or job classification" that has "great promotion potential." James believed that he had to transfer away from Omaha to obtain a position as a technically trained agent and to further advance his goal of becoming a supervisory special agent. According to James, when he began training as a technically trained agent, there were already some technically trained agents working in the Omaha Division of the FBI. Since a new technically trained agent was hired in 2015, bringing the total to three for the Omaha Division, James believed it unlikely that a position in Omaha would become available soon. James admitted that his position in Omaha would not have been eliminated and that he was in no danger of being laid off, fired, or demoted.

Upon his transfer to Nevada, James' rate of pay increased by $162 per year based on a change in locality pay. Additionally, Nevada does not have state income tax which resulted in a $500 increase in his monthly paychecks after the transfer. James had been compensated at the "GS-13, step four" pay grade in Omaha. Shortly before trial, his pay grade was changed to "GS-13, step five," which increased his annual salary by about $2,100. He admitted that he would have had this same pay grade increase if he had stayed in Omaha because the change was based on "time and service" with the FBI and not the transfer to Nevada.

James' current position in Nevada is not considered a promotion, but he believes that he will have the opportunity to advance in the Las Vegas division. James will have to be in the position of a technically trained agent in Nevada for at least a year before becoming eligible for a promotion into the position of supervisory special agent. If promoted to supervisory special agent, he would be able to work in that capacity for seven years, after which he would either be promoted to an assistant agent in charge or be demoted. James had not received any notice that he would be eligible for promotion or that a position was coming available as of the date of trial. James made the application to transfer to Nevada before he or Jacqulyn did any research with regard to schools, living conditions, homes, activities, or other factors relating to the children's interests. Jacqulyn testified, however, that if they had discovered that "the living conditions were awful for [their] kids," they would not have moved to Nevada.

James and Jacqulyn purchased a residence in Summerlin, Nevada, with five bedrooms, four and a half bathrooms, and a swimming pool. Their previous residence in Nebraska was of similar size. According to James, the Nebraska residence was in the La Vista area and was in a "nice" neighborhood. He described their Nevada neighborhood as "very family-oriented," with many children Hailey's age living there. James and Jacqulyn researched the schools in the Summerlin area, primarily over the internet and through discussion with James' future Nevada coworkers. They liked what they learned about the Nevada schools. Jacqulyn has had contact with the school Hailey would attend if allowed to move to Nevada. She testified that she was familiar with "the rating or grades" that this school has, and knowing that information, she is not concerned about the school.

Before moving to Nevada in May 2016, Jacqulyn was employed at a hospital in Omaha as a pediatric nurse. She had the ability to set her schedule and chose to work a 7 p.m. to 7 a.m. shift three times per week for an average of 36 hours per week. Her hourly rate of pay prior to the move was $28.68 per hour. After moving to Nevada in May 2016, she found employment at a Summerlin hospital as a pediatric nurse and worked the same schedule as in Omaha. Her hourly pay rate in Nevada was initially about $10 more per hour than her pay rate in Nebraska, and at the time of trial, she was earning $39.94 per hour. She did not seek career advancement in Omaha prior to moving to Nevada and did not allege in her modification complaint that her increased income was cause for removal of Hailey from the jurisdiction.

Jacqulyn testified that she was the primary caregiver for Hailey before her move to Nevada. She based this assertion, in part, on the fact that she was the parent who typically took Hailey to her doctor and dental appointments. Jacqulyn also picked Hailey up from school and provided childcare during times when Brian and Kristen were unavailable. When Hailey was in Kindergarten, Jacqulyn picked her up and took her to school every day. She also picked Hailey up from school which ended at 3 p.m. and cared for Hailey after school until Brian arrived at her residence around 4:15 p.m. She estimated that her parenting time with Hailey "over the last couple of years" had been approximately 70 percent, also stating that she spends more time with Hailey "during the day . . . while she's awake." Jacqulyn agreed that "generally speaking," between 2009 and her move to Nevada, any deviations from the parenting plan were mutually agreed upon by her and Brian. James' testimony about Jacqulyn's parenting time with Hailey was consistent with Jacqulyn's testimony.

Brian and Kristen testified that Brian had 50 percent of the parenting time with Hailey. Brian works Monday through Friday from 7 a.m. to 3:30 p.m. Due to his schedule, Brian is required to seek childcare for Hailey on occasion. Before Jacqulyn moved, he would offer that time to her pursuant to the decree. Brian explained that the only times Jacqulyn's after school care of Hailey occurred (outside of her own scheduled parenting time) was on Wednesdays and every other Friday. There was also testimony that Brian helped Jacqulyn by voluntarily agreeing to change the parenting time schedule for the years 2009 to 2013 to accommodate Jacqulyn's work schedule at that time, while still allowing Brian to have 50 percent of the parenting time. The record also shows that there were times that Brian received additional parenting time from Jacqulyn.

Jacqulyn testified that she believed Hailey's hygiene needs were not met when in Brian's care. According to Jacqulyn, there have been times when Hailey returned from Brian's house with

greasy hair or a "white kind of buildup" in her hair from "not showering properly" or frequently enough. Jacqulyn also testified that it did not look like Hailey combed her hair in the mornings at Brian's house. She stated that Hailey had been picked on by another girl at school because of her hair and that she had discussed this with Brian and with Hailey's teacher. She indicated that the hygiene and clothing issue had been a problem for many years. Jacqulyn agreed that the move to Nevada required a change in Hailey's physical custody, but she testified that she felt her concerns (such as hygiene) were valid reasons to change custody as well. James' testimony about the hygiene issue was consistent with Jacqulyn's. Brian and Kristin denied there was a hygiene issue. Brian testified that the first time the issue was raised was after James submitted his application to transfer to Nevada.

Jacqulyn's parents testified that they saw Hailey regularly for family dinners before Jacqulyn moved to Nevada. Brian testified that he would give Jacqulyn's parents access to Hailey upon request. Jacqulyn's brother is the dental hygienist who cleans Hailey's teeth about every six months. He has children who play well with Hailey when they get together, which was about once a month prior to Jacqulyn's move. Since her move, Brian has facilitated contact between Hailey and these children. Brian also takes Hailey to meet with Jacqulyn's sister and her children.

Brian's father and step-mother see Hailey at least once a week. Brian's father also sees Hailey on a number of holidays, birthdays, and other occasions when he gets together with Brian, Kristen, and Hailey. Brian's father has a brother and sister who each have children and grandchildren in the Omaha or Fremont area and the whole family gets together several times a year. Kristen also has family in the Omaha area. Her family has contact with Hailey approximately once a month.

Neither Brian nor Jacqulyn have any family in Nevada.

James testified that Hailey has a good relationship with the child he and Jacqulyn share, as well as with James' other children. James has "full-time" physical possession of the children from his previous relationship, other than the child who remained in Omaha, and these children spend time with their mother during the winter, spring, and summer school breaks. Accordingly, if Hailey does not attend school in Nevada and only spends her summers there, she will not see James' minor children from his previous relationship. The record also reflects that Hailey has a good relationship with the child that Brian and Kristen have in common.

At the time of trial, Hailey was 8 years old and in the third grade. Hailey's second grade teacher described Hailey as "respectful," "responsible," and an "outstanding student." She also testified that Hailey was "[v]ery well-behaved," was "[q]uiet but social with her friends," and had no behavioral issues. According to the teacher, who had also observed Hailey during the then current school year, Hailey was happy and popular at her school in Omaha and had a number of good friends. The teacher also testified that Hailey appeared neat, clean, well-groomed, and appropriately dressed. She never noticed Hailey's hair being unkempt or dirty. When Brian sent her an email inquiring if she had noticed any changes in Hailey's hygiene, she responded that she had not.

Hailey has friends at her Nebraska school and in the activities in which she is involved. Some of her friends live near Brian's residence, and he often schedules Hailey's play dates at his residence. Jacqulyn testified that Hailey would be sad to leave her friends in Nebraska but that she

has also made "some great new friends in Nevada." Despite Hailey being "shy and timid," Jacqulyn felt she would be able to adjust to living in Nevada. In Nebraska, Hailey participates in dance, has participated previously in gymnastics, and Brian has signed her up for Girl Scouts which had not yet started as of the date of trial.

The record shows that Hailey is a good student, and both parties agree that the Nebraska school is of high quality. Both parties indicated they were satisfied with the performance of the teachers at the Nebraska school and that Hailey appears to fit in and have good grades there. According to Brian, Hailey was "thriving" at the Nebraska school.

The parties agree that they have been able to work together to make decisions about Hailey's education, medical care, and religious development. However, the record shows that the parties have used "vulgar" or "foul" language on occasion in communicating with one another. Jacqulyn testified that they had both used such language, but Brian denied ever communicating with Jacqulyn in that way. And, in 2010, in an email to Brian's parents, Jacqulyn threatened to move to Arizona with Hailey because she did not "want to have to deal with" Brian.

Jacqulyn was not requesting a change in legal custody. Brian testified that the parties' communication issues created a barrier to continuing joint legal custody. Brian was unable to identify any "bad decisions" made by Jacqulyn on behalf of Hailey that would disqualify her from being a joint legal custodial parent.

Brian testified that he opposed letting Hailey move to Nevada because she has a lot of family in Nebraska and because he feels that "Las Vegas is not the place to raise a family." He also testified that "the way [Jacqulyn] talks to [him] sometimes" would make it "very hard to facilitate a long-distance relationship with [Hailey]." Brian felt that his relationship with Jacqulyn as a co-parent would deteriorate if Jacqulyn was allowed to move Hailey to Nevada.

There were times before Jacqulyn moved to Nevada that she was not available when Brian offered her additional parenting time. During those times, he sometimes used outside childcare providers when Kristen was not available. Brian submitted exhibits showing childcare expenses, but he admitted that he had not provided all such documentation to Jacqulyn. He testified that he had not done so because Jacqulyn told him she would not pay her portion of these expenses. Accordingly, he believed that presenting further documentation to her would "be a meaningless act." Brian testified that the childcare expenses totaled $2,258, and he asked the court to order Jacqulyn to pay 50 percent ($1,129).

Jacqulyn testified that as of April 26, 2016, Brian had requested that she reimburse him for 50 percent of $1,860 in childcare expenses. Jacqulyn had briefly reviewed the childcare expense exhibits and testified that Brian had not previously provided her with all of the receipts for those expenses. She testified that what he previously provided was "not this many pages" and that he "[j]ust said, this is what you owe" without attaching any documentation. She testified, however, that she did not have any reason to believe Brian had not incurred the listed expenses.

The district court entered an order of modification on January 20, 2017. The court discussed the evidence concerning Jacqulyn's assertion that she had been the primary care giver for Hailey, finding that the additional parenting time Jacqulyn received was contemplated by the right of first refusal in the parenting plan attached to the decree. The court denied Jacqulyn's request to modify custody, finding she failed to meet her burden of showing that a material change

of circumstances warranted a change from joint physical to sole physical custody. The court awarded Brian sole physical custody of Hailey "because Jac[qulyn] moved to Nevada which makes joint physical custody unworkable going forward." The court maintained joint legal custody in both parties.

The district court then denied Jacqulyn's request to remove Hailey to Nevada "on the basis that she is not the custodial parent." The court found that Jacqulyn did not have a legitimate reason to leave the state because she and James "did not seek better employment in Nebraska and it is speculative whether [James'] transfer in the [FBI] will result in greater income, benefits, or career-advancement potential." Despite that finding, the court proceeded to analyze the facts under the best interest factors set forth by the Nebraska Supreme Court in *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999). We discuss the court's determinations with respect to the *Farnsworth* factors in the analysis section below.

The court awarded Jacqulyn nine consecutive weeks of summer parenting time; certain holiday, winter break, and spring break parenting time; and telephone and "FaceTime" contact. The court ordered Jacqulyn to pay child support of $708 per month beginning December 1, 2016 and gave Jacqulyn an 80 percent abatement during the three summer months that Hailey is in her possession. The court also provided an additional abatement with regard to expenses incurred by Jacqulyn in transporting Hailey to and from Nevada. The court specified the payment of childcare expenses and non-covered medical and dental expenses and ordered the parties to pay their own attorney fees and costs.

Finally, the district court denied Brian's application for contempt. The court determined that Brian failed to provide adequate evidence that he presented proper documentation, receipts, or other verifying documentation of childcare expenses to Jacqulyn within 30 days as specified in the decree.

## III. ASSIGNMENTS OF ERROR

Jacqulyn asserts, restated, that the district court erred in finding she did not have a legitimate reason to leave the jurisdiction and that removal from Nebraska to Nevada was not in Hailey's best interests.

On cross-appeal, Brian asserts that the district court erred in failing to (1) award him sole legal custody, (2) order child support retroactive to May 1, 2016 with an abatement of 80 percent for the month of July, and (3) order Jacqulyn to reimburse him for her portion of the childcare expenses pursuant to the decree.

## IV. STANDARD OF REVIEW

Child custody determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *Whilde v. Whilde*, 298 Neb. 473, 904 N.W.2d 695 (2017). An abuse of discretion occurs when the trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *In re Change of Name of Whilde*, 298 Neb. 510, 904 N.W.2d 707 (2017). A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly

depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Osantowski v. Osantowski*, 298 Neb. 339, 904 N.W.2d 251 (2017). In child custody cases, where the credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *State on behalf of Jakai C. v. Tiffany M.*, 292 Neb. 68, 871 N.W.2d 230 (2015).

In a civil contempt proceeding where a party seeks remedial relief for an alleged violation of a court order, an appellate court employs a three-part standard of review in which (1) the trial court's resolution of issues of law is reviewed de novo, (2) the trial court's factual findings are reviewed for clear error, and (3) the trial court's determinations of whether a party is in contempt and of the sanction to be imposed is reviewed for abuse of discretion. *Martin v. Martin*, 294 Neb. 106, 881 N.W.2d 174 (2016).

## V. ANALYSIS

### 1. MODIFICATION OF CUSTODY AND REMOVAL FROM JURISDICTION

Jacqulyn asserts that the district court erred in finding she did not have a legitimate reason to leave the jurisdiction and that removal from Nebraska to Nevada was not in Hailey's best interests.

In order to prevail on a motion to remove a minor child to another jurisdiction, the custodial parent must first satisfy the court that he or she has a legitimate reason for leaving the state. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015). After clearing that threshold, the custodial parent must also demonstrate that it is in the child's best interests to continue living with him or her in the new location. *Id.* The paramount consideration is whether the proposed move is in the best interests of the child. *Id.* In this case, Jacqulyn is not Hailey's sole custodial parent. Rather, Jacqulyn is a joint legal and joint physical custodian seeking to modify the decree in order to obtain sole physical custody of Hailey and move her to Nevada.

Ordinarily, custody of a minor child will not be modified unless there has been a material change in circumstances showing that the custodial parent is unfit or that the best interests of the child require such action. *Whilde v. Whilde*, 298 Neb. 473, 904 N.W.2d 695 (2017). First, the party seeking modification must show a material change in circumstances, occurring after the entry of the previous custody order and affecting the best interests of the child. *Id.* Next, the party seeking modification must prove that changing the child's custody is in the child's best interests. *Id.*

Removal of a child from the state, without more, does not amount to a change of circumstances warranting a change of custody. *Schrag v. Spear, supra*. Nevertheless, when considered in conjunction with other evidence, such a move may well be a change of circumstances that would warrant a modification of the decree. *Id.*

In cases of joint legal and physical custody, a legitimate reason for leaving the state, taken together with an expressed intent to do so, may constitute a material change in circumstances affecting the best interests of a child, sufficient to require examination of the best interests of the child. *Brown v. Brown*, 260 Neb. 954, 621 N.W.2d 70 (2000). Proving an intent to leave the state does not necessitate that physical custody be modified, but the intent to move illustrates the

likelihood that there is a need for considering some sort of modification that would reflect the new circumstances. *Id.* Once the party seeking modification has met this threshold burden, the separate analyses of whether custody should be modified and whether removal should be permitted necessarily become intertwined. *Id.* The question becomes whether the best interests of the child are furthered by the relocating parent's obtaining sole physical custody and moving the child out of state. See *id.*

Under Nebraska law, the burden has been placed on the custodial parent to satisfy the court that he or she has a legitimate reason for leaving the state and to demonstrate that it is in the child's best interests to continue living with him or her. *Brown v. Brown, supra*. Because the burden of proof in relocation cases is already placed on the parent seeking leave to relocate, it is unnecessary to reallocate that burden in cases of joint legal and physical custody. *Id.* As a practical matter, the existence of a joint physical custody relationship is likely to make it more difficult for the relocating parent to meet the burden associated with relocation. See *id.*

(a) Legitimate Reason to Leave State

In considering a motion to remove a child to another jurisdiction, the purpose of requiring a legitimate reason is to prevent the custodial parent from relocating the child because of an ulterior motive, such as frustrating the noncustodial parent's visitation rights. *Daniels v. Maldonado-Morin*, 288 Neb. 240, 847 N.W.2d 79 (2014). Absent aggravating circumstances, the Nebraska Supreme Court has held that career advancement of the parent, career advancement of the new spouse, and the desire to form a new family unit through remarriage are legitimate reasons to remove a child to another jurisdiction. *Id.* Absent evidence of an ulterior motive, a custodial parent's desire to live with his or her current spouse, who is located outside of the custodial jurisdiction, is a legitimate reason to remove the minor child. *Id.*

In this case, Jacqulyn has left Nebraska to be with her current spouse, James, as well as James' children and the child shared by Jacqulyn and James. Her relocation was necessitated by James' employment transfer from Nebraska to Nevada. Clearly, given the joint legal and physical custodial arrangement between Jacqulyn and Brian, some modification of at least the physical custody of Hailey is necessary. In finding that Jacqulyn did not have a legitimate reason to leave the state, the district court observed that Jacqulyn and James did not seek better employment in Nebraska and found it "speculative" as to whether James' transfer would result in greater income, benefits, or career-advancement potential. However, career enhancement for a custodial parent's spouse is a legitimate reason for removal, and neither a custodial parent nor the spouse of a custodial parent is required to exhaust all possible job leads locally before securing a better position in another state. See *McLaughlin v. McLaughlin*, 264 Neb. 232, 647 N.W.2d 577 (2002). The record shows at least some potential for enhancement of James' career through his pursuit of a technically trained agent position in Nevada. And, regardless of any enhancement of James' career, he has been transferred to Nevada, and Jacqulyn and James are married with a child in common. Moving to Nevada to live with her current spouse, their child, and their blended family is a legitimate reason to relocate in and of itself. Accordingly, we conclude in our de novo review that Jacqulyn met the threshold burden of showing a legitimate reason to relocate to Nevada.

(b) Child's Best Interests

In determining whether removal to another jurisdiction is in the child's best interests, the trial court considers (1) each parent's motives for seeking or opposing the move; (2) the potential that the move holds for enhancing the quality of life for the child and the custodial parent; and (3) the impact such a move will have on contact between the child and the noncustodial parent, when viewed in the light of reasonable visitation arrangements. *McLaughlin v. McLaughlin, supra.*

*(i) Each Parent's Motives*

The ultimate question in evaluating the parties' motives in seeking removal of a child to another jurisdiction is whether either party has elected or resisted a removal in an effort to frustrate or manipulate the other party. *McLaughlin v. McLaughlin, supra.*

In evaluating this factor, rather than considering the parties motives (i.e., Brian and Jacqulyn's motives), the district court considered Brian and James' positions with respect to Hailey's removal to Nevada. The court found that James was acting in good faith because he wanted to move to Nevada to improve his chances at a job promotion and that Brian was acting in good faith because allowing Hailey to move to Nevada would materially affect his parenting time.

After considering the parties' motives in favoring or opposing the removal, we reach the same conclusion as the district court, that "[t]his consideration is not a factor of consequence in the analysis." Jacqulyn denied moving to Nevada to limit Brian's time with Hailey. She testified that her reason for moving was James' career and their family's "growing and success." Although Jacqulyn previously threatened to move to Arizona to limit her dealings with Brian, we do not find this evidence contradicts her legitimate desire to move to Nevada to further James' career. Brian opposes Hailey's removal to Nevada because it would limit her time with family in Nebraska and the move would make it harder for him to maintain a relationship with Hailey, especially given the communication difficulties between him and Jacqulyn. Both parties have valid reasons for their respective positions on Hailey's removal. There is no evidence of improper motives by either party.

*(ii) Quality of Life*

In determining the potential that the removal to another jurisdiction holds for enhancing the quality of life of the child and the custodial parent, a court should evaluate the following considerations: (1) the emotional, physical, and developmental needs of the child; (2) the child's opinion or preference as to where to live; (3) the extent to which the relocating parent's income or employment will be enhanced; (4) the degree to which housing or living conditions would be improved; (5) the existence of educational advantages; (6) the quality of the relationship between the child and each parent; (7) the strength of the child's ties to the present community and extended family there; (8) the likelihood that allowing or denying the removal would antagonize hostilities between the two parties; and (9) the living conditions and employment opportunities for the custodial parent because the best interests of the child are interwoven with the well-being of the custodial parent. *Boyer v. Boyer*, 24 Neb. App. 434, 889 N.W.2d 832 (2017). This list of factors to be considered in determining the potential that the removal to another jurisdiction holds for enhancing the quality of life of the parent seeking removal and of the children should not be

misconstrued as setting out a hierarchy of factors. *McLaughlin v. McLaughlin*, 264 Neb. 232, 647 N.W.2d 577 (2002). Depending on the circumstances of a particular case, any one factor or combination of factors may be variously weighted. *Id.*

### a. Emotional, Physical, and Developmental Needs

The district court found evidence that Hailey's emotional, physical, and developmental needs could be met in either Nebraska or Nevada. The court found it clear that the parties both love Hailey very much and are fit parents. We agree. The parties both have a good relationship with Hailey, and she has spent roughly half her time with each parent since the dissolution of their marriage. This factor is neutral.

### b. Child's Preference

Since Hailey did not testify, this factor is neutral.

### c. Enhancement of Income and Employment

A custodial parent's income can be enhanced because of a new spouse's career opportunities, for purposes of determining the potential that removal of children to another jurisdiction holds for enhancing the quality of life of the parent seeking removal and of the children. *Colling v. Colling*, 20 Neb. App. 98, 818 N.W.2d 637 (2012). See, also, *McLaughlin v. McLaughlin, supra*. As discussed above, James has a greater potential for advancement along his chosen career path in the FBI in Nevada than he did in Nebraska. His pay grade has increased since his transfer, but that particular increase would have occurred even if he had stayed in Nebraska. James did receive a slight locality pay increase due to the transfer and benefits from the lack of state income taxes. Thus, Jacqulyn's income is at least somewhat enhanced by James' career opportunities in Nevada, and Jacqulyn's own income has increased by about $10 per hour in Nevada. However, there was no evidence adduced about the cost of living in Nevada as compared to Nebraska. We conclude, as did the district court, that this factor weighs only slightly in favor of removal.

### d. Housing and Living Conditions

The evidence shows that the residence purchased by Jacqulyn and James in Nevada is of a similar size and located in a similar type of neighborhood to their residence in Nebraska. The main difference being that the Nevada residence has a swimming pool. The district court found that the swimming pool weighed slightly in favor of removal. In our de novo review, we find that this factor is neutral.

### e. Educational Advantages

Brian and Jacqulyn agree that Hailey's school in Nebraska is a quality school. Jacqulyn researched the school in Nevada and testified that it was comparable. In analyzing this factor, the district court focused on evidence showing that Hailey is an excellent student, is shy and timid, and may have trouble adjusting and making new friends. The court found that Hailey's ties to the school in Nebraska and the quality of her grades weighs heavily against removal. In our de novo review, we focus on the lack of evidence showing that the school in Nevada presents superior

educational advantages to the school in Nebraska. The existence of educational advantages factor receives little or no weight when the custodial parent fails to prove that the new schools are superior. *Boyer v. Boyer*, 24 Neb. App. 434, 889 N.W.2d 832 (2017). This factor does not weigh for or against removal.

### f. Quality of Relationship Between Child and Parents

Hailey appears to have a very good relationship with both parents and she has thrived under the joint physical custody arrangement. This factor does not prevent or favor the move.

### g. Ties to Community and Extended Family

Hailey has multiple relatives in the Omaha area that she sees on a regular basis. Hailey also has a half-sibling, who is Brian's child with Kristen. And, she has a number of friends from school, in Brian's neighborhood, and from her various activities in Nebraska. On the other hand, Hailey has another half-sibling living in Nevada. Also, two of James' children from his prior relationship live with James and Jacqulyn in Nevada; if Jacqulyn is not allowed to remove Hailey to Nevada, Hailey will not see these children who spend their summers in Nebraska with their mother, and she will have limited time with her half-sibling who lives in Nevada. Neither of the parties has extended family in Nevada. Given the number of familial ties and friendships that Hailey has in Nebraska, the district court did not abuse its discretion in finding that this factor weighs heavily against removal.

### h. Hostilities Among Parents

In analyzing this factor, the district court stated:
The potential for antagonizing hostilities between the parents exits if the move is allowed. The parties' relationship was cooperative previously under the joint physical custody arrangement, although there is evidence that [Jacqulyn] threatened to move to Arizona in the past, and that she used insulting, degrading and vulgar language towards [Brian]. The proposed removal has clearly caused a great deal of tension between the parties; however, Brian has continued to keep [Jacqulyn's] family involved in Hailey's life. Brian has asked Hailey to contact [Jacqulyn] via FaceTime and telephone on a daily basis since [Jacqulyn] moved to Nevada. There is evidence that [Jacqulyn] used those times on the phone to question Hailey about her hygiene to try to bolster her case for custody. The Court's opinion is that allowing [Jacqulyn] to take Hailey to Nevada will create hostilities between the parties. Brian has demonstrated maturity in providing access to [Jacqulyn] on a nightly basis despite being ridiculed by [her]. This factor weighs against removal.

Our de novo review of the record supports the district court's findings, and we agree with the court's conclusion on this factor.

### i. Well-Being of Custodial Parent

The final "quality of life" factor is consideration of the "living conditions and employment opportunities for the custodial parent, because the best interests of the child are interwoven with the well-being of the custodial parent." See *Farnsworth v. Farnsworth*, 257 Neb. 242, 251, 597

N.W.2d 592, 599 (1999). The district court did not address this final factor. Because Jacqulyn had joint physical custody of Hailey at least 50 percent of the time, her separation from Hailey during the school year if she is not allowed to remove Hailey will undoubtedly have some impact on Jacqulyn's well-being. This factor weighs slightly in favor of removal.

### j. Quality of Life Conclusion

Jacqulyn presented evidence that the quality of life for Hailey might be improved by some aspects of living in Nevada. However many of these factors are neutral, weighing neither in favor of or nor against removal, and any improvement is off-set by those factors weighing against removal. Upon our de novo review, we conclude that Jacqulyn has not shown that the quality of life would be improved for Hailey by the move to Nevada.

### (iii) Impact of Move on Contact Between Brian and Hailey

The final consideration is the impact of relocation upon Brian's ability to maintain a meaningful parent-child relationship with Hailey. The impact the move will have on contact between the child and the noncustodial parent must be viewed in light of the court's ability to devise reasonable parenting time arrangements. See *Steffy v. Steffy,* 287 Neb. 529, 843 N.W.2d 655 (2014). A reasonable visitation schedule is one that provides a satisfactory basis for preserving and fostering a child's relationship with the noncustodial parent. *Id.* Of course, the frequency and the total number of days of parenting time and the distance traveled and expense incurred go into the calculus of determining reasonableness. See *Farnsworth v. Farnsworth, supra*. Indications of the custodial parent's willingness to comply with a modified parenting time schedule also have a place in this analysis. See *id.*

In this case, of course, we are not presented with the impact of a child's move upon a noncustodial parent as Brian is Hailey's joint legal and physical custodian. When faced with this situation, Nebraska appellate courts have considered the impact of the move on contact between the child and the parent opposing relocation. See, *Brown v. Brown*, 260 Neb. 954, 621 N.W.2d 70 (2000); *Bird v. Bird*, 22 Neb. App. 334, 853 N.W.2d 16 (2014). In doing so, the courts have considered the ability of the parent opposing removal to maintain a meaningful relationship with the child through reasonable parenting time arrangements. See *id*.

Jacqulyn asked the court to allow Hailey to attend school in Nevada. If allowed to move Hailey to Nevada, Jacqulyn was in favor of Brian having parenting time during "Thanksgiving break, Christmas break, spring break, and then all summer," although she testified that she would like to have a week of summer parenting time with Hailey to allow for a family vacation. She was also willing to "forgo a portion of the child support" to allow for payment of a portion of Hailey's travel. Regardless, it is clear that Hailey's removal to Nevada would allow Brian significantly less contact with Hailey than he had under the parties' joint custody arrangement. Prior to Jacqulyn's move to Nevada, Brian was able to spend time with Hailey on a weekly basis. Although generous, Jacqulyn's proposed parenting time plan will be a poor substitute for that weekly contact. This consideration is significant in our de novo review, given the context of joint legal and physical custody. See *Brown v. Brown, supra*.

The district court analyzed this factor in terms of the impact on Jacqulyn's parenting time (if the removal was denied) and whether the court could fashion a reasonable parenting time schedule between Jacqulyn and Hailey. Although the court did not analyze the impact of removal on Brian's ability to maintain a meaningful parent-child relationship with Hailey, we agree with the court's conclusion that this factor does not favor removal.

### (c) Best Interests Conclusion

Upon our de novo review, we cannot conclude it was not in Hailey's best interests to permit Jacqulyn to remove her to Nevada. Although Jacqulyn had a legitimate reason for leaving the state, she did not prove that Hailey's quality of life would be improved by the move, and the move would have a detrimental effect on the relationship between Brian and Hailey. Accordingly, we conclude that the district court did not err in denying Jacqulyn's request to modify custody and her request to remove Hailey to Nevada. Jacqulyn's assignment of error is without merit.

### 2. BRIAN'S CROSS-APPEAL

### (a) Legal Custody

Brian asserts that the district court erred in failing to award him sole legal custody. He argues, as he did at trial, that Jacqulyn's use of vulgar language in communicating with him and the fact that the parties no longer lived in the same state made the joint legal custody arrangement unworkable. The district court modified the decree to award Brian sole physical custody of Hailey, but other than stating that Brian "testified that it is Hailey's best interest[s] that both parents continue to be awarded joint legal and physical custody," the court made no findings about joint legal custody.

At trial, Jacqulyn testified that she was not asking the court to change joint legal custody. Although Brian indicated that he would not have sought a modification of the parties' joint legal and physical custody arrangement if Jacqulyn had not sought modification and removal, he testified that the parties' communication difficulties created a barrier to continued joint legal custody.

"Legal custody means the authority and responsibility for making fundamental decisions regarding the child's welfare, including choices regarding education and health," and "[j]oint legal custody" is the "mutual" exercise of that authority. Neb. Rev. Stat. §§ 43-2922(11) and (13) (Reissue 2016). Typically, courts do not award joint legal custody when the parties are unable to communicate effectively. See, *Kamal v. Imroz*, 277 Neb. 116, 759 N.W.2d 914 (2009) (joint decisionmaking by parents not in child's best interests when parents unable to communicate face-to-face and have level of distrust); *Klimek v. Klimek*, 18 Neb. App. 82, 775 N.W.2d 444 (2009) (failure to award joint custody not abuse of discretion when child confused by temporary joint legal and physical custody arrangement and parents have difficulty communicating).

While the record reflects some use of vulgarity and name-calling in text communications exchanged by the parties since the decree, the record also reflects that the parties have been able to work together to reach joint decisions with respect to Hailey's education, healthcare, and religious upbringing. Jacqulyn observed that one of the reasons she and Brian divorced was because of the acrimony between them, and she testified that she had never "spoken ill" of Brian

to or in front of Hailey. Certainly, some level of contention might be expected in communications between divorced parties, and the record does not show that the communication difficulties reflected in the present record were such that the district court would have been persuaded to decree differently if the difficulties had been known at the time of the initial decree. Brian has failed to present evidence of a material change in circumstance. See *State on behalf of Jakai C. v. Tiffany M.*, 292 Neb. 68, 871 N.W.2d 230 (2015). The court did not abuse its discretion in failing to modify the award of joint legal custody.

(b) Retroactive Child Support

Brian asserts that the district court erred in failing to order child support retroactive to May 1, 2016 with an abatement of 80 percent for the month of July.

Whether a child support order should be retroactive is entrusted to the discretion of the trial court, and an appellate court will affirm its decision absent an abuse of discretion. *Johnson v. Johnson*, 290 Neb. 838, 862 N.W.2d 740 (2015). In determining whether to order a retroactive modification of child support, a court must consider the parties' status, character, situation, and attendant circumstances. *Id.* Absent equities to the contrary, modification of a child support order should be applied retroactively to the first day of the month following the filing date of the application for modification. Id. In modification of child support proceedings, the children and the custodial parent should not be penalized by delay in the legal process, nor should the noncustodial parent gratuitously benefit from such delay. *Id.*

In the 2009 decree, Brian was ordered to pay child support of $168.18 per month. Jacqulyn filed her complaint to modify, and Brian filed his counterclaim in March 2016. Jacqulyn and James moved to Nevada in May. On May 18, the district court entered a temporary order abating Brian's child support obligation until further order of the court, effective June 1. The court granted Brian temporary primary physical possession of Hailey and gave Jacqulyn summer visitation from July 1 through August 10. The court entered an order of modification on January 20, 2017, awarding Brian sole physical custody of Hailey. The court ordered Jacqulyn to pay Brian child support of $708 per month effective December 1, 2016, and gave her an 80-percent abatement during the months of June, July, and August during which Hailey was to be in her possession. The court did not make any specific findings on the issue of retroactivity of child support.

Brian argues that the modified child support award should have been made retroactive to May 1, 2016, the month when Jacqulyn moved to Nevada. He argues that 100 percent of the burden for raising Hailey fell on him and Kristen in the period between May 1 and December 1 when he had temporary primary possession of Hailey without a corresponding child support payment obligation from Jacqulyn. He argues further that there is no evidence in the record that she did not have the ability to pay retroactive child support.

In our de novo review of the record, we find no evidence of "equities to the contrary" that would justify not following the general rule regarding retroactivity stated above. Although the modification action was commenced in March 2016, the parties maintained their joint custody arrangement until Jacqulyn's move in May. Thereafter, Hailey was in Brian's primary possession from May 1 through the time of trial in September, except for Jacqulyn's summer parenting time between July 1 and August 10. Thus, we conclude that the district court abused its discretion in

- 15 -

not awarding Brian retroactive child support from May 1 through December 1. We agree that Jacqulyn's child support obligation should be abated 80 percent for the month of July. We modify the order accordingly.

## (c) Reimbursement for Childcare Expenses

Brian asserts that the district court erred in failing to order Jacqulyn to reimburse him for her portion of the childcare expenses pursuant to the decree. In the decree, the court ordered the parties' to each pay half of the childcare expenses incurred by the other party due to that party's employment or education. The parties were to provide each other with receipts within 30 days incurring such expenses. Brian filed a contempt action due to Jacqulyn's failure to pay her portion of certain childcare expenses. At trial, he presented documentation of expenses totaling $2,258, and asked the court to order Jacqulyn to pay half, although it is clear that he did not present her with documentation of all of those expenses within 30 days as required by the decree. Jacqulyn confirmed that Brian had not presented her with all of the receipts proffered at trial. The court denied Brian's contempt action based on his failure to provide adequate evidence that he presented proper verifying documentation to Jacqulyn within 30 days pursuant to the decree. Under these circumstances, the court did not abuse its discretion in failing to find Jacqulyn in contempt.

## VI. CONCLUSION

The district court did not abuse its discretion in denying Jacqulyn's request to modify custody and her request to remove Hailey to Nevada. Further, the court did not abuse its discretion in failing to modify the award of joint legal custody or in failing to find Jacqulyn in contempt. However, we conclude that the district court abused its discretion in failing to order Jacqulyn's child support obligation be retroactive to May 1, 2016, with abatement of 80 percent for the month of July. We modify this portion of the order.

AFFIRMED AS MODIFIED.